

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>    Recurrido<br><br><br>                v.<br><br><br>Ramón Millán Pacheco<br><br>    Peticionario | Certiorari<br><br>2011 TSPR     118<br><br>182 DPR _____ |

Número del Caso: CC      - 2009 - 919


Fecha: 9 de agosto de 2011


Tribunal de Apelaciones:

          Región de Ponce Panel IX


Juez Ponente:                Hon. Sixto Hernández Serrano


Abogado de la Parte Peticionaria:

          Lcdo. Elmer A. Rodríguez Berríos


Oficina de la Procuradora General:


          Lcdo. Reinaldo Camps del Valle
          Procurador General Auxiliar


Materia:      Art. 106 CP, Arts. 5.04 y 5.05 Ley de Armas

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

        v.                CC-2009-919     Certiorari

Ramón Millán Pacheco

    Peticionario

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 9 de agosto de 2011.

En *Pueblo v. Domínguez Fraguada*, 105 D.P.R. 537, 541 (1977), citamos lo expresado por el ilustrado Foro de Instancia al final de su resolución, expresión que en esta ocasión nos vemos compelidos a citar nuevamente, con aprobación:

> Cierto que al mantener los postulados de una democracia a veces... [alguno] logra escapar de su justo castigo, pero ese es el precio que, aunque doloroso, hemos escogido pagar, porque si abandonamos estos principios algún día terminaremos pagando el precio de nuestra propia libertad.

## I

Contra el peticionario Ramón L. Millán Pacheco el Ministerio Público presentó una acusación por

asesinato en primer grado[1] y dos acusaciones por los Arts. 5.04 y 5.05 de la Ley de Armas.[2] Luego de la presentación de los pliegos acusatorios y el acto de lectura de acusación, el peticionario solicitó *inter alia* la supresión de una confesión que éste hiciera durante la etapa investigativa del caso. El 6 de septiembre y 9 de octubre de 2009 se celebraron las vistas sobre supresión de confesión, en las que el Ministerio Público presentó como único testigo al agente Fernando Tarafa, Agente Investigador de la División de Homicidios de la Policía de Puerto Rico en la Ciudad de Ponce.

Las circunstancias que precedieron la confesión en controversia fueron las siguientes: después de haber obtenido mediante *subpoena* una foto del aquí peticionario Millán Pacheco, el 7 de marzo de 2009 a eso de las 2:00 p.m., el agente Fernando Tarafa se presentó, junto a tres agentes policiacos más y dos vehículos oficiales, al apartamento del peticionario Millán Pacheco en el Residencial Perla del Caribe en Ponce.[3] Estando allí, el agente Tarafa le pidió a Millán Pacheco que lo acompañara, transportándolo en el asiento trasero de uno de los vehículos oficiales hasta la Comandancia de la Policía.[4]

---

[1] Art. 106 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4734.

[2] 25 L.P.R.A. sec. 458(c) y 458(d).

[3] Véase Transcripción Estipulada de la Vista de Supresión de Confesión, Apéndice de la Petición de *Certiorari*, pág. 224.

[4] Íd. pág. 246.

Una vez en la Comandancia, Millán Pacheco es conducido a un cuarto en el segundo piso, donde el agente Tarafa comienza a interrogarlo sin advertirle primero de sus derechos según la cláusula constitucional de no autoincriminación de la Quinta Enmienda federal, conocidas como las advertencias de Miranda ("*Miranda Warnings*"). Después de aproximadamente **una hora** de interrogatorio,[5] el agente Tarafa confronta en un momento dado a Millán Pacheco con un conflicto entre lo que éste estaba narrando y lo que otras personas ya entrevistadas habían narrado al agente. En ese momento y como producto de esa confrontación, Millán Pacheco comienza a llorar y admite haber dado muerte al Sr. Luis A. León Ramírez, quien fuera un guardia de seguridad en una finca en la que Millán Pacheco trabajaba.

Admitido ese hecho por parte de Millán Pacheco, el agente Tarafa inmediatamente lo detiene para que éste no declarara más y procede a leerle las advertencias de Miranda, las cuales Millán Pacheco firma.[6] Acto seguido, el

---

[5] Véase Transcripción Estipulada de la Vista de Supresión de Confesión, Apéndice de la Petición de *Certiorari,* pág. 263.

[6] Las advertencias que leyó, inició  y firmó el peticionario Millán Pacheco fueron las siguientes:
"1. Usted tiene derecho a permanecer callado y a no declarar.
2. Cualquier cosa que usted diga puede ser usada en su contra.
3. Usted tiene el derecho a hablar con un abogado para que le ` aconseje antes de hacerle cualquier pregunta y además dicho abogado puede acompañarlo durante el interrogatorio.
4.  Si usted no puede pagar un abogado le conseguiré uno antes de interrogarlo, libre de costo alguno, si así lo desea.
5. Si usted se decide a contestar mis preguntas sin estar asistido por un abogado, puede negarse a contestar cualquier pregunta y en cualquier momento puede dejar de contestar y solicitar asistencia legal.

agente Tarafa insta a Millán Pacheco a narrar lo ocurrido, quien confiesa todos los detalles de lo acontecido el día de los hechos incluyendo la forma en que escondió el cuerpo de la víctima, descripción que coincidió perfectamente con la forma en que el cadáver había sido hallado, según la investigación de la Policía.

Lo sucedido al momento de la admisión y posterior confesión de Millán Pacheco, según el testimonio vertido por el propio agente Tarafa en la vista de supresión de confesión, fue lo siguiente:

> Pregunta de la defensa: *"¿Y qué hizo... según usted?"*
>
> Respuesta del Agente Tarafa: *"No, porque él se quedó... hablando conmigo, en la mecánica que él me habla y yo escribo y que estamos hablando cuando él me dice que el guardia de seguridad lo vio que había llegado* **y yo dije: "adiós, pero fíjate que el guardia de seguridad no te vio a ti"; y entonces ahí bajó la cabeza y comenzó a llorar y ahí fue que me dijo "lo maté, yo lo maté". Luego de eso pues fue que yo le hice las advertencias de ley..."**
>
> Pregunta la defensa: *"Y entonces dijo, yo lo maté, yo lo maté, ¿usted le hizo las advertencias de ley?"*
>
> Respuesta del Agente Tarafa: *"Sí, se las leí".*[7]
>
> ...
>
> Pregunta de la defensa: *"... ¿cuáles fueron las advertencias que usted alega haberle dicho a Ramón [Millán Pacheco]?"*

---

6. Su declaración tiene que ser libre, voluntaria y espontánea y no se puede ejercer presión, ni amenaza, ni coacción para obligarlo a declarar.
   [¿Ha]entendido lo que le he explicado?
   [¿]Desea usted declarar?"
Apéndice de la Petición de *Certiorari*, pág. 61.

[7] Apéndice de la Petición de *Certiorari*, págs. 260-261.

Respuesta del Agente Tarafa: *"Esas advertencias están en un papel, impresas en un papel el cual yo se las leí, después de leérselas...se las entregué y él las leyó, luego de eso las firmó cada una como que las entendió".*

Pregunta de la defensa: *"¿Qué escolaridad tiene Ramón?"*

Respuesta del Agente Tarafa: *"El me había indicado que advino hasta el séptimo grado pero él me indicó que sabía leer y escribir".*

Pregunta de la defensa: *"Sí, ¿y en su instrucción de las advertencias específicamente le preguntó (sic) si usted hizo una lectura de las mismas, 1,2,3,4,5,6,7, acápite?"*[8]

Respuesta del Agente Tarafa: *"Yo leí lo que estaba en el papel".*

Pregunta de la defensa: ***"Okay, usted le dijo, Ramón tú estás aquí admitiendo que hiciste, cometiste un delito, ¿usted le dijo eso****?"*

Respuesta del Agente Tarafa: ***"Bueno al momento en que..."***

...

Pregunta de la defensa: ***"Le pregunto ¿si usted le dijo a Ramón, tú acabas de hacer una admisión de un, de la comisión de un delito****?"*

Respuesta del Agente Tarzafa: ***"Así no".***

Pregunta de la defensa: ***"No, ¿le dijo, tú estás aquí ahora, se te puede acusar por el delito de asesinato, le dijo eso?"***

....

Respuesta del Agente Tarafa: ***"En esas palabras no".***[9]

...

Pregunta de la defensa: ***"...le pregunto, ¿si usted le dijo a él que él tenía el derecho a quedarse callado, no decir nada más?"***[10]

---

[8] Íd., pág. 278.

[9] Véase Transcripción Estipulada de la Vista de Supresión de Confesión, Apéndice de la Petición de *Certiorari*, pág. 279.

[10] Íd. pág. 281.

> Respuesta del Agente Tarafa: ***Bueno, todo estaba en el papel que yo le leí las advertencias de ley"***.
>
> Pregunta de la defensa: **"Si o no, Tarafa"**.
>
> Respuesta del Agente Tarafa: **"Sí, porque eso estaba en el papel"**.
>
> Pregunta de la defensa: **"¿Específicamente en que número de las advertencias, deme las advertencias, en qué número de las advertencias es que dice, usted tiene derecho a no declarar más?"**
>
> Respuesta del Agente Tarafa: **"Lo que dice es que si de decidirse declarar puede ser usado en su contra"**.[11] (Énfasis y subrayado nuestro.)

Como producto de este interrogatorio, Millán Pacheco no sólo confesó con lujo de detalles haber asesinado a su víctima -incluyendo el móvil de su injuria y el lugar donde escondió el cadáver-, sino que indicó el sitio donde había escondido un arma de fuego que había utilizado como parte del crimen y posteriormente él mismo condujo a la Policía al lugar donde ciertamente se ocupó dicha arma.[12] De hecho, como producto de esa misma confesión, Millán Pacheco condujo también a los policías al lugar donde había quemado un vehículo de motor perteneciente a su víctima Luis A. León y que había sido objeto de una disputa entre éste y Millán Pacheco.[13]

Sometido el asunto, el 25 de abril de 2008 el Tribunal de Primera Instancia emitió una Resolución en la

---

[11] Íd.

[12] Véase Declaración Jurada del Agente Fernando Tarafa, Apéndice de la Petición de *Certiorari*, pág. 39.

[13] Íd.

que ordenó la supresión de la confesión de Millán Pacheco.[14]
En su resolución y con relación a su determinación de que
durante el interrogatorio el aquí peticionario se
encontraba bajo la custodia de la Policía, la Juez de
instancia señaló lo siguiente:

> En el caso de autos, según testificó
> en esencia el agente Tarafa, luego de
> haber entrevistado a los empleados de la
> finca y a la esposa del occiso, s[ó]lo le
> faltaba por entrevistar al acusado por lo
> que solicitó un subpoena para saber alguna
> información y una foto de éste. **De esa
> manera se personaron a la casa del
> acusado, según testificó el Agente Tarafa
> en la vista, dos patrullas con cuatro
> agentes.**
>
> **De ese lugar se movieron en la
> patrulla de la Policía con el acusado,
> hacia la Oficina de Homicidios de Ponce
> para entrevistarlo, por lo que el acusado
> no fue citado, sino que fue llevado ese
> mismo día a la Oficina, en el vehículo de
> la Policía. La forma y manera en que se
> llevó a cabo el proceso para entrevistar
> al acusado, al llegar a la residencia,
> este grupo de policías, no constituyó ni
> tenía el único propósito de establecer una
> mera entrevista con el acusado, bajo estas
> circunstancias la intervención iba
> dirigida a <u>intervenir</u> con un sospechoso.**
> Más aun cuando antes de realizar esta
> intervención con el acusado, el Agente
> Tarafa, había realizado ciertas
> investigaciones y entrevistas que
> señalaban al acusado, estas consistían en
> que el acusado había tenido un problema
> con el occiso en relación a un vehículo,
> donde había intervenido la Policía.
> (Énfasis y subrayado nuestro.)[15]

---

[14] Véase Resolución del Tribunal de Primera Instancia, Apéndice de la
Petición de *Certiorari*, pág. 23.

[15] Íd., pág. 27

Así, por la prueba presentada durante la vista de supresión de confesión, el foro primario determinó que al momento de surgir la confesión de Millán Pacheco la investigación de la Policía estaba centrada sobre su persona y que éste se encontraba bajo custodia, por lo que se había activado a su favor el mecanismo profiláctico de las advertencias de Miranda, en virtud de la garantía constitucional de la no autoincriminación. A renglón seguido, el Tribunal de Primera Instancia concluyó que el Estado no pudo demostrar que el acusado renunció de una manera voluntaria e inteligente a su derecho a la no autoincriminación. Expresamente el Tribunal de Primera Instancia señaló lo siguiente:

> Mediante el testimonio del Agente Tarafa el Estado no demostró que la renuncia del acusado a su derecho a la no autoincriminación fuera una voluntaria e inteligente, en donde se comprobara efectivamente que el acusado quedó informado de la renuncia a su privilegio constitucional contra la autoincriminación, incluyendo la advertencia de que cualquier manifestación suya podría ser usada en su contra en un proceso criminal. En este caso la renuncia que realizó el acusado a pesar de que firmó el documento que le proveyó el Agente Tarafa sobre las advertencias de ley no completa el requisito de la certeza efectiva de que el acusado tenía pleno conocimiento de la naturaleza del derecho que renunciaba y de las consecuencias que implicaba la misma.[16]

Ante la supresión de la confesión del acusado por parte del Tribunal de Primera Instancia, el Estado acudió

---

[16] Íd., pág. 31.

en recurso de *certiorari* al Tribunal de Apelaciones, el cual expidió el auto y revocó tal determinación. En su sentencia, el foro apelativo intermedio determinó, basado en su interpretación de lo ocurrido en la vista de supresión de confesión, que cuando el agente Tarafa se personó a la residencia de Millán Pacheco "no contaba con evidencia alguna que le permitiera inferir que [éste] había asesinado al señor León Ramírez, ya que aparentemente no tenía motivo alguno para cometer el delito antes mencionado".[17] Al final de su sentencia, el foro apelativo intermedio concluye lo siguiente:

> Nótese que según se desprende del expediente y los testimonios vertidos en las vistas de supresión de confesión... el señor Millán Pacheco no era sospechoso del delito de asesinato hasta después de iniciada la entrevista, por lo que sería absurdo pensar que los agentes policíacos intentaron intimidarlo o coaccionarlo con el fin de obtener una admisión o confesión de parte. Además, del testimonio de la señora Rivera Torres surge que el señor Millán Pacheco no fue coaccionado por los agentes del orden público. Más aún, durante la vista no se presentó evidencia sobre coerción alguna. Luego de la confesión voluntaria, que el Agente Tarafa procedió a hacerle las advertencias legales y fue el acusado quien optó por continuar ofreciendo las declaraciones incriminatorias, a sabiendas de que podrían ser usadas en su contra durante el juicio. Incluso, el señor Millán Pacheco leyó, inició y firmó la hoja que contenía las advertencias. Por lo que, no cabe la menor duda de que la renuncia al derecho constitucional de autoincriminación del señor Millán Pacheco fue una libre, voluntaria e inteligente desde el comienzo

---

[17] Apéndice de la Petición de *Certiorari*, pág. 408.

y sin que hubiera mediado coacción o intimidación por parte de los funcionarios del orden público. Cabe señalar, que toda confesión o admisión obtenida con posterioridad a las advertencias legales será admisibles, ya que se entiende que hubo una renuncia consciente del derecho antes mencionado.

Asimismo, de la prueba presentada surgió que al señor Millán Pacheco no se le había restringido su libertad, ya que podía irse del cuartel en cualquier momento. Por el contrario, el interrogatorio se llevó a cabo con el único propósito de recopilar información para esclarecer el crimen.

Por tanto, no siendo el señor Millán Pacheco sospechoso del crimen al momento de la confesión, encontrándose en libertad de movimiento y siendo dichas declaraciones incriminatorias ofrecidas libre, voluntaria, inteligente y sin haber mediado coacción o intimidación alguna por los agentes del orden público, concluimos que el TPI erró al suprimir la confesión del acusado.[18]

Inconforme, el Sr. Millán Pacheco recurre ante nuestra consideración planteando -mediante recurso de *Certiorari*- que erró el Tribunal de Apelaciones al revocar la determinación del Tribunal de Primera Instancia y concluir que ese foro se había equivocado al suprimir la confesión del peticionario, esto "sin haber respetado la deferencia que merece el Tribunal de Primera Instancia quien dirimió la credibilidad de los testigos".[19] Perfeccionado el recurso, nos disponemos a resolver.

---

[18] Íd., págs. 413-415.

[19] El peticionario plantea como "señalamiento de error adicional" que el Tribunal de Apelaciones carecía de jurisdicción para intervenir en el recurso instado por el Estado. No obstante, tal planteamiento ya fue

## II

"La mejor evidencia para conectar a una persona con la comisión de un delito en calidad de autor es su confesión".[20] Es por eso que el interrogatorio a un sospechoso se ha "considerado como una de las técnicas de investigación policial de mayor efectividad".[21] Ahora bien, en vista de que "el derecho a un juicio justo e imparcial queda vulnerado cuando un acusado llega a juicio con la presunción de culpabilidad que su confesión genera... [sobre todo] cuando esta admisión de culpabilidad ha sido el producto de tácticas viciadas utilizadas por el organismo investigativo",[22] el Tribunal Supremo federal ha entendido necesario establecer medidas dirigidas a prevenir que tal vulneración no sea el producto de la violación al derecho constitucional que asiste a todo ciudadano a no autoincriminarse.

El derecho contra la autoincriminación se encuentra consagrado primeramente en la Quinta Enmienda de la Constitución federal, la cual dispone: "*[n]o person... shall be compelled in any criminal case to be a witness against himself...*".[23] Por su parte, el Art. II, Sec. 11 de

_____

resuelto mediante una Resolución que emitimos el 12 de diciembre de 2008, asunto que advino final y firme.

[20] O.E. Resumil, Derecho Procesal Penal, Oxford, Butterworth Legal Publishers, 1993, T. I, pág. 346.

[21] Íd.

[22] Íd.

[23] Emda. V, Const. EE.UU., L.P.R.A., Tomo I, ed. 1999.

la Constitución de Puerto Rico, establece que "[n]adie será obligado a incriminarse mediante su propio testimonio...".[24] El derecho constitucional contra la autoincriminación constituye la protección más importante con la que cuenta todo ciudadano que enfrenta un interrogatorio como parte de una investigación criminal y la misma se activa aún en ausencia de algún indicio de coacción durante ese interrogatorio.[25] En esencia se trata de que "ninguna persona está obligada a contestar preguntas ni a decir algo que lo ponga en riesgo de responsabilidad criminal".[26]

La controversia que nos ocupa en el caso de autos se enmarca en la alegada violación de lo dispuesto por el Tribunal Supremo federal en el histórico precedente de Miranda v. Arizona, 384 U.S. 436 (1966), y la serie de casos que le han sucedido. En Miranda v. Arizona, *supra*, -una opinión suscrita por el entonces Juez Presidente y ex fiscal Earl Warren- la Corte Suprema federal, aclarando y ampliando a su vez lo resuelto en Escobedo v. Illinois, 378 U.S. 478 (1964), pautó "que para hacer valer el derecho contra la autoincriminación... en el contexto de [un] interrogatorio... [a] un sospechoso bajo custodia, era esencial reconocerle al interrogado el derecho a estar asistido por abogado [consagrado en la Sexta Enmienda de la

_____

[24] Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1.

[25] E.L. Chiesa Aponte, Derecho procesal penal: etapa investigativa, Publicaciones JTS, 2004, pág. 25.

[26] Íd., pág. 15.

Constitución federal]".[27]  Las advertencias que se enumeran en la importante decisión de Miranda v. Arizona, *supra*, por ser medidas dirigidas a garantizar[28] el derecho fundamental de un sospechoso contra la autoincriminación, constituyen, desde el año 1965, las garantías mínimas que amparan a todo interrogado bajo custodia policial en los estados[29] y en Puerto Rico.

Vale la pena resaltar que los principios establecidos en Miranda v. Arizona, *supra*, ya habían sido reconocidos por esta Curia al adoptar, en Rivera Escuté v. Jefe de Penitenciaría, 92 D.P.R. 765 (1965), los pronunciamientos del Tribunal Supremo federal en Escobedo v. Illinois, *supra*. Así, en Rivera Escuté señalamos que:

> no son admisibles en evidencia en el 'proceso criminal' la confesión de un acusado o sospechoso o las admisiones que le perjudiquen sustancialmente, obtenidas de él bajo custodia de la policía u otra autoridad competente mientras se le interroga con el fin de obtener manifestaciones incriminatorias: (1) cuando no fue advertido de manera eficaz por la policía u otra autoridad competente antes de declarar, de su derecho constitucional absoluto a permanecer en silencio y a no incriminarse; y (2) cuando no fue advertido por la policía u otra autoridad competente antes de declarar, de su derecho a tener ayuda de abogado, sin que el hecho de no haber sido solicitada afirmativamente por el acusado releve de la obligación de advertirle su derecho a

---

[27] Chiesa Aponte, op. cit., págs. 26-27.

[28] Moran v. Burbine, 475 U.S. 412 (1986).

[29] Malloy v. Hogan, 378 U.S. 1 (1964).

tenerla; o (3) cuando solicitó consultar con abogado y no se le permitió el estar así asistido al obtenerse su declaración.[30]

El caso de Miranda v. Arizona, *supra*, establece que en toda investigación criminal realizada por agentes del orden público, si esa investigación se ha centrado sobre un ciudadano que se encuentra bajo la custodia de esos agentes y éstos a su vez pretenden interrogarlo, el Estado viene obligado a advertirle de ciertos derechos que le asisten constitucionalmente contra la autoincriminación y de su derecho a ser asistido por un abogado. Pueblo v. López Guzmán, 131 D.P.R. 867 (1992). El propósito de la decisión Miranda v. Arizona, *supra*, fue reducir, mediante la implementación de la Cláusula de No Autoincriminación, el riesgo de que se produjeran confesiones bajo coerción. Como consecuencia, el Tribunal Supremo federal concluyó que era necesario que el acusado estuviera **informado de una manera adecuada y efectiva** de sus derechos, y que tales derechos debían ser totalmente respetados.[31]

En específico, las llamadas Advertencias de Miranda comprenden lo siguiente, aunque las mismas no tienen que seguir un lenguaje exacto:[32] que la persona tiene que ser advertida de su derecho a guardar silencio; que cualquier

---

[30] Rivera Escuté v. Jefe de Penitenciaría, 92 D.P.R. 765, 776, (1965).

[31] Chávez v. Martinez, 538 U.S. 760, 790 (2003); Miranda v. Arizona, 384 U.S. 436, 467(1966).

[32] Pueblo v. López Rodríguez, 118 D.P.R. 515 (1987); Pueblo v. García Ciuro, 134 D.P.R. 13 (1993) (Sentencia).

declaración que haga podrá y será usada como evidencia en su contra; y que tiene derecho a ser asistido por un abogado ya sea que la persona lo contrate o, de carecer de recursos económicos, asignado por el Estado.[33]

El derecho constitucional a la no autoincriminación, aunque fundamental y trascendental para nuestra democracia, es claramente renunciable,[34] siempre y cuando tal renuncia sea voluntaria, consciente e inteligente.[35] Al definir el concepto de voluntariedad, y citando con aprobación a Moran v. Burbine, 475 U.S. 412 (1986), señalamos que:

> al evaluar la voluntariedad de esta renuncia deberán analizarse dos vertientes, a saber: primero, el abandono del derecho debe haber sido voluntario en el sentido de que sea producto de una elección libre y deliberada, y segundo, la renuncia debe hacerse con pleno conocimiento no sólo del derecho abandonado, sino de las consecuencias de esa decisión. Una renuncia será voluntaria si es "realizada sin que haya mediado intimidación, coacción o violencia por parte de los funcionarios del Estado en el procedimiento que culmina en la toma de la confesión".[36]

---

[33] Miranda v. Arizona, *supra*.

[34] Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 775-776 (1991), citando a Pueblo en interés menor J.A.B.C., 123 D.P.R. 551, 561-562 (1989).

[35] Pueblo v. Viruet Camacho, 173 D.P.R. 516 (2008); Pueblo v. Suárez, 163 D.P.R. 460 (2004); Pueblo v. Medina Hernández ,158 D.P.R. 489 (2003); Pueblo v. Rivera Nazario, 141 D.P.R. 865 (1996); Pueblo v. García Ciuro, *supra*; Pueblo v. Ruiz Bosch, *supra*; Pueblo en interés menor J.A.B.C., 123 D.P.R. 551 (1989); Pueblo v. López Rodríguez, *supra*.

[36] Pueblo v. Medina Hernández, *supra*, pág. 504 (Escolio omitido.)

Por otro lado, cuando señalamos que la renuncia al derecho a la no autoincriminación hecha por un ciudadano que enfrenta un interrogatorio bajo la custodia del Estado debe efectuarse de manera "consciente e inteligente", hablamos de que a éste le sean transmitidas, de una manera eficaz, las garantías detalladas por el Tribunal Supremo federal en Miranda v. Arizona, supra.[37] Ello no requiere que éstas sean recitadas de manera exacta o estereotipadamente, como si fueran parte de un "conjuro talismánico" ("no talismanic incantation [is] required to satisfy [Miranda's] strictures,")[38]. No obstante, más recientemente, el propio Tribunal Supremo federal ha advertido que para ciertas circunstancias en particular sería de igual manera "absurdo pensar que la mera recitación de la letanía sería suficiente para satisfacer Miranda en cada circunstancia concebible" ("it would be absurd to think that mere recitation of the litany suffices to satisfy Miranda in every conceivable circumstance").[39]

Por último, probar que la admisión o confesión hecha por un acusado como parte de un interrogatorio efectuado por el Estado -y que se pretende presentar como prueba sustantiva en su contra- obedeció a una renuncia válida de

---

[37] Pueblo v. Viruet Camacho, supra; Pueblo v. Medina Hernández, supra, pág. 505; Pueblo v. Rivera Nazario, supra, pág. 888; Pueblo en interés menor J.A.B.C., supra, pág. 562; Pueblo v. Ruiz Bosch, supra, pág. 775; Rivera Escuté v. Jefe Penitenciaría, supra, pág. 781; Moran v. Burbine, supra; Miranda v. Arizona, supra.

[38] Pueblo v. Rivera Nazario, supra, 888; California v. Prysock, 453 U.S. 355, 359 (1981).

[39] Missouri v. Seibert, 542 U.S. 600, 611 (2004).

las protecciones constitucionales, es tarea que corresponde al Ministerio Público.[40] Es el Ministerio Público el que tiene el peso de probar, mediante preponderancia de la prueba, que la renuncia del acusado a sus derechos bajo la Cláusula de no autoincriminación fue voluntaria, consciente e inteligente, debiendo para ello desfilar evidencia detallada sobre las advertencias específicas que se le hicieron al sospechoso y sobre las condiciones imperantes en el momento en que éste hizo la admisión o confesión.[41] El incumplimiento por parte del Estado con esta normativa, habiéndose dado las circunstancias que hacen obligatoria su ejercicio, conlleva la supresión de manera profiláctica de cualquier declaración incriminatoria hecha por el acusado, evitando así una violación al derecho a la no autoincriminación que cobija a todo ciudadano.[42]

---

[40] Pueblo v. Medina Hernández, *supra*, pág. 508; Pueblo v. García Ciuro, *supra*, pág. 17; Pueblo v. Pellot Pérez, 121 D.P.R. 791, 802 (1988).

[41] Pueblo v. Medina Hernández, *supra*, pág. 508; Pueblo v. Ruiz Bosch, *supra*, pág. 776. Véanse además, Colorado v. Cornelly, 479 U.S. 157, 169 (1986); Brown v. Illinois, 422 U.S. 590, 604 (1975); Lego v. Twomey, 404 U.S. 477, 489 (1972).

[42] Es menester recordar que no se consuma una violación a la Cláusula Constitucional contra la auto incriminación por el sólo hecho de que la policía haya obtenido una declaración incriminatoria en violación a lo establecido en Miranda v. Arizona, *supra*. Como claramente lo explica el Juez Thomas en United States v. Patane, 542 U.S. 630, 641 (2004):

> "It follows that police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial".

**III**

Para poder reclamar con éxito una violación a las normas establecidas en Miranda v. Arizona, *supra*, es necesario que converjan  los siguientes requisitos: (1) que la persona haya hecho la declaración incriminatoria como producto de un interrogatorio del Estado, (2) que tal interrogatorio haya ocurrido mientras la persona era considerada sospechosa del delito que se investiga, y (3) que tal interrogatorio haya ocurrido estando la persona bajo la custodia del Estado.[43] Veamos si en el caso de autos se cumple con esos requisitos.

### *La Declaración de Millán como producto de un interrogatorio*

En Rhode Island v. Innis, 446 U.S. 291 (1980), el Tribunal Supremo federal determinó que el concepto "interrogatorio" que activa las salvaguardas de Miranda v. Arizona, *supra*, *envuelve* no solamente un interrogatorio expreso ("*express questioning*"), sino su equivalente funcional ("*functional equivalent*"). El interrogatorio expreso es aquel en el que la declaración incriminatoria es producida como respuesta a una pregunta directa de los agentes del Estado. En otras palabras, aquel en el que los agentes del Estado incurren en alguna conducta contentiva de preguntas o conversación con el propósito de que el apelante hiciera manifestaciones incriminatorias.[44]

---

[43] Pueblo v. López Guzmán, 131 D.P.R. 867 (1992).

[44] Íd.

En cambio, el "equivalente funcional" de un "interrogatorio expreso" lo constituye "cualesquiera palabras o conducta de parte de la policía (que no sean aquellas normalmente presentes en el arresto y custodia) que la policía debió haber sabido que con razonable probabilidad producirían respuestas incriminatorias por parte del sujeto".[45]

En el caso de autos no se ha cuestionado y no existe duda con relación a que para efectos de las Advertencias de Miranda el aquí peticionario fue sujeto de un interrogatorio expreso al momento de hacer la admisión y confesión en controversia. Basta señalar que el agente Tarafa estuvo con Millán Pacheco en un cuarto, haciéndole preguntas directas con relación a lo ocurrido el día de los hechos, por espacio de casi una hora, antes de que surgieran las expresiones incriminatorias. Tales circunstancias constituyen claramente un interrogatorio directo o expreso.[46]

### Millán Pacheco como sospechoso

En Pueblo v. Rivera Escuté, supra, pág. 773, adoptando la norma de Escobedo v. Illinois, supra, pautamos que cuando una investigación criminal conducida por el Estado "ya no es una averiguación general de un crimen sin resolver sino que ha empezado a concentrarse sobre" una

---

[45] Chiesa, op. cit., pág. 32.

[46] Véase Rhode Island v. Innis, 446 U.S. 291 (1980).

persona en particular, nos encontramos ante un sospechoso del crimen.

Argumentando que el peticionario Millán Pacheco no era considerado como sospechoso por el Estado al momento de la intervención con éste, el Ministerio Público expresó en su alegato lo siguiente:

> El Agente Tarafa dejó claramente establecido en su declaración jurada que como parte de su deber investigativo entrevistó a **todos** los empleados de la Finca Bocachica. El Sr. Millán no podía ser la excepción. Máxime cuando, aparte de ser empleado de la Finca, trabajó en la misma el día de accidente. La intervención del agente con el Sr. Millán estuvo motivada entonces por el cumplimiento de su deber ministerial de investigar. (Énfasis en el original.)[47]

El Ministerio Público hace énfasis en que el agente Tarafa entrevistó a **todos** los empleados de la Finca Bocachica y, por lo tanto, Millán Pacheco no podía ser la excepción, "[m]áxime cuando, aparte de ser empleado de la Finca, trabajó en la misma el día de accidente". Tal argumento, lejos de favorecer la teoría del Ministerio Público de que Tarafa no consideraba a Millán Pacheco un sospechoso, la debilita.

Ciertamente el agente Tarafa entrevistó **a todas** las personas que de alguna manera pudieran aportar algo con relación al crimen ocurrido. De hecho, lo cierto es que el agente Tarafa, dos días antes del interrogatorio en la

---

[47] Alegato del Ministerio Público, pág. 28.

comandancia con Millán Pacheco, también había entrevistado a la viuda del occiso. En cuanto a esto último, durante la vista de supresión de confesión se le preguntó al agente Tarafa si era cierto que cuando él llegó a buscar a Millán Pacheco a su apartamento, ya se había entrevistado con los compañeros de Millán Pacheco y del difunto León Ramírez con relación a que éstos habían tenido un problema por un vehículo de motor. A esto, Tarafa señaló que esa información quien se la había provisto fue la esposa del occiso, el 5 de marzo de 2007.[48]

Por otro lado, el agente Tarafa admitió que antes de interrogar a Millán Pacheco en la Comandancia él sabía, por información provista por las personas que había entrevistado, que la única persona que estaba trabajando en la finca junto al occiso el día de los hechos era Millán Pacheco.[49] De hecho, durante la vista preliminar de este caso el agente Tarafa señaló lo siguiente:

> *Testigo [Tarafa]: Bueno, yo entrevisté, mucho
> antes de, de yo encontrarlo a él,*

---

[48] Véanse Transcripción de la Vista de Supresión de Confesión, Apéndice de la Petición de *Certiorari*, pág. 248, y Transcripción de la Vista Preliminar, Apéndice de la Petición de *Certiorari*, pág. 63.

[49] Véase Transcripción de la Vista de Supresión de Confesión, Apéndice de Petición de *Certiorari*, pág. 311. Además, según la declaración jurada prestada por el propio agente Fernando Tarafa ante el Fiscal Ernesto Quesada Ojeda el 20 de marzo de 2007 (Apéndice de Petición de *Certiorari*, pág. 39) Tarafa señala que el occiso Luis A. León Ramírez había sido reportado como desaparecido el 3 de marzo de 2007. El 5 de marzo de 2007 encuentran el cadáver de León Ramírez en la Finca Bocachica del Bo. Manzanilla. Tarafa señala en su declaración jurada que como parte de la investigación se entrevistaron a las personas que se encontraban el sábado 3 de marzo de 2007 "laborando o en los predios de la finca [Bocachica]" y señala que el acusado "fue la única persona que ese día estaba laborando en la finca, al cual se pudo contactar para entrevista el 7 de marzo de 2007". Véase, además, Transcripción de la Vista Preliminar, Apéndice de la Petición de *Certiorari*, pág. 62.

> *[refiriéndose a Millán Pacheco] yo me entrevisté con los empleados de, de la finca porque a pesar de que no estaban trabajando habían unos empleados que habían ido a la finca...*
>
> *...*
>
> *Defensa: ¿Y los entrevistó?"*
>
> *Testigo [Tarafa]: Yo los entrevisté y la información que me aportaron en general, fue de que  cuando salieron... ellos se pararon en el área de empaque de la finca a lavarse las manos, y allí pues habían observado a Luis [el occiso] y a Ramón [Millán Pacheco] en un tractor verde que es de la finca eh, sentado allí.*
>
> *Defensa: ¿**No vieron nada anormal**?*
>
> *Testigo [Tarafa]: **No, en ese momento, lo único, que estaban separados uno en la mesa y el otro en el carrito y se notaba como que no se hablaban**, fue lo único que expresaron...*

De manera que, precisamente porque había entrevistado **a todas** las personas que tenían que ver con el asunto **antes** de entrevistar a Millán Pacheco, ya el agente Tarafa tenía información que colocaba a Millán Pacheco, **el día de los hechos, en el lugar de los hechos, a solas con la víctima y en actitud discrepante o al menos poco comunicativa uno con el otro.**

Ahora bien, Tarafa sabía algo más.  Tarafa sabía que, según la información provista por la esposa de la víctima, la **única persona** con la que el occiso León Ramírez había tenido un problema serio -de tal magnitud que tuvo que llamarse a la policía- fue con el acusado Millán Pacheco.[50]

---

[50] Transcripción de la Vista de Supresión de Confesión, Apéndice de la Petición de *Certiorari*, págs. 248-249, 252.

Con relación a esto último, el agente Tarafa testificó en la Vista de Supresión lo siguiente:

> *Defensa: "... ¿dígame si es cierto que ya usted había entrevistado y les pidió una información de los compañeros de Ramón y del difunto de que ellos habían tenido un problema con un vehículo de motor?"*
>
> *Testigo [Tarafa]: "Bueno, esa información quien me la había dado había sido la esposa".*
>
> *Defensa: "¿La esposa?"*
>
> *Testigo [Tarafa]: "Sí, la esposa de... del occiso".*
>
> *Defensa: "¿La esposa del muerto?"*
>
> *Testigo [Tarafa]: Exacto... ella me había dicho que el único problema que había tenido su esposo era con relación al vehículo".*
>
> *...*
>
> *Defensa: "... y le pregunto, ¿si también usted tuvo información de que había tenido que llamar a la policía para romper el negocio que había hecho el muerto con Ramón [Millán Pacheco]?"*
>
> *Testigo [Tarafa]: "Pues, eso fue un mes antes de que paso esto".*
>
> *Juez: "Que habían tenido que llamar a la policía para romper un negocio o contrato que había entre las partes de ahí".*
>
> *Testigo [Tarafa]: "Eso fue lo que informó la Sra. Silvia [esposa del occiso]".*
>
> *Defensa: "Okay, ¿y la Sra. Silvia también le dijo que su esposo nunca había tenido problemas con ninguno de los compañeros?"*
>
> *Testigo [Tarafa]: "Que no era una persona de problemas".*

Además, cuando el agente Tarafa acude a buscar a Millán Pacheco a su residencia, es obvio que tenía que saber que el tan mencionado vehículo del occiso Luis León Ramírez no había sido encontrado, a pesar de que el cadáver de su dueño hacía dos días que había aparecido en la finca

Bocachica; el mismo vehículo por el cual víctima (León Ramírez) y victimario (Millán Pacheco) habían tenido un muy serio conflicto.

En fin, al momento de su entrevista con Millán Pacheco, el agente Tarafa -un agente con trece años de experiencia al momento de la investigación- al menos podía adjudicarle a Millán Pacheco tanto **motivo**, como **oportunidad** para cometer el crimen. Ante este cuadro, resulta algo inverosímil pensar que el agente Tarafa sólo consideraba a Millán Pacheco un testigo más. Así tampoco lo creyó el Tribunal de Primera Instancia y nos parece que su determinación es correcta.

Es basado en todo lo anterior que no podemos aceptar la concepción del foro apelativo intermedio de que el día en que el agente Tarafa se personó a la casa del peticionario Millán Pacheco, Tarafa "no contaba con evidencia alguna que le permitiera inferir que el señor Millán Pacheco había asesinado al señor León Ramírez, ya que aparentemente no tenía motivo alguno para cometer el delito antes mencionado".[51] La manera en que el agente Tarafa hizo las gestiones para identificar al Sr. Millán Pacheco,[52] buscarlo en su apartamento y transportarlo

---

[51] Sentencia de Tribunal de Apelaciones, pág. 6, Apéndice de la Petición de Certiorari, pág. 403.

[52] Del testimonio del agente Tarafa surge que, antes de ir al apartamento de Millán Pacheco, éste le había solicitado al dueño de la finca donde Millán Pacheco trabajaba una foto de este último. En vista de que no la pudo conseguir por ese medio, Tarafa consiguió un *subpoena* y obtuvo la foto. Véase Transcripción de la Vista de Supresión de Confesión, Apéndice de la Petición de *Certiorari*, págs. 255-256.

finalmente a la comandancia, nos mueve a entender como razonable y confirmar el criterio del foro de primario de que la investigación del crimen se había centrado en ese momento en el aquí peticionario; esto es, que Millán Pacheco era en ese momento sospechoso del crimen que estaba siendo investigado por el Estado.

### *Millán Pacheco se encontraba bajo custodia*

En Stansbury v. California, 511 U.S. 318 (1994), el Tribunal Supremo de los Estados Unidos señaló lo siguiente con relación a su evaluación del interrogatorio bajo custodia como requisito al derecho a las advertencias de *Miranda*:

> Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.[53]

_____

[53] Stansbury v. California, 511 U.S. 318, 323 (1994). Los hechos de Stansbury, *supra*, son los siguientes: el 28 de septiembre de 1982 la niña Robyn Jackson desapareció de un parque de juegos en una comunidad de Los Ángeles, California. En la mañana del día siguiente, un testigo de nombre Andrew Zimmerman observó a un hombre bajarse de un vehículo sedán americano color turquesa y tirar algo a un canal de agua, como a diez millas del lugar de donde había desaparecido la niña. Zimmerman dio aviso a la policía, los que finalmente encontraron el cuerpo muerto de la menor en el canal de agua. Los análisis patológicos concluyeron que la niña también había sido violada.

Estos hechos fueron investigados por el teniente Thomas Johnston. El teniente Johnston entrevistó a unos testigos el día que el cuerpo de la niña fue encontrado, recibiendo información relacionada a que el día de su desaparición, unas horas antes la menor había estado hablando con dos personas que manejaban una guagua de helados, uno de los cuales resultó ser el acusado Stansbury. Basado en la información provista por los testigos, originalmente el Teniente Johnston pensó que Stansbury y el otro vendedor de helados podrían tener alguna conexión con el asesinato o al menos tener información relacionada. Sin embargo, y por razones que no son pertinentes, Johnston no consideraba a Stansbury un sospechoso, sino a la otra persona que estaba con éste y que alegadamente también había hablado con la niña el día de los hechos.

En ese contexto el Tribunal Supremo federal indica

que no tiene consecuencia alguna si el policía que está

_____

Después que la persona que sí era considerada sospechosa fue traída al cuartel para ser interrogada, el Teniente Johnston le pidió a un oficial de nombre Lee que contactara a Stansbury para ver si éste podía comparecer al cuartel para ser entrevistado en calidad de un posible testigo. Recibida esta encomienda, el oficial Lee se presentó a la casa de Stansbury esa noche a las 11:00 p.m., junto a tres agentes vestidos de civiles. Al llegar, los demás oficiales rodearon la puerta de la residencia, mientras Lee tocaba anunciando su llegada. Cuando Stansbury contesta, el oficial Lee le responde que ellos eran oficiales de la policía, que estaban investigando un asesinato del cual él podía ser un posible testigo y que si era posible que los acompañara al cuartel para contestar algunas preguntas. Stansbury accede y voluntariamente se monta en el asiento delantero de la patrulla de la policía para ser transportado al cuartel.

En el cuartel, el Teniente Johnston interrogó a Stansbury en presencia de otros oficiales de la policía con relación a lo que él supiera y lo que había estado haciendo la tarde y noche del 28 de septiembre. Ni Johnston ni ninguno de los oficiales de la policía le hizo a Stansbury las advertencias *Miranda* en ese momento. Entre las cosas que Stansbury dijo durante ese interrogatorio señaló que la noche del 28 de septiembre había hablado con la niña asesinada a eso de las 6:00 p.m., que había regresado a su casa como a las 9:00 p.m. y que luego había salido nuevamente en el carro de su compañera, un sedán americano color turquesa.

Este último detalle levantó las sospechas del Teniente Johnston en vista de que el carro color turquesa coincidía con la descripción del carro de la persona que tiró el cadáver al canal de agua, dada por el Sr. Andrew Zimmerman el día después de los hechos. Cuando respondiendo a más preguntas Stansbury admite que anteriormente él había sido convicto de violación, secuestro y abuso de menores, el Teniente Johnston da por terminada la entrevista y otro oficial le hace entonces las advertencias *Miranda* al acusado Stansbury. En ese momento Stansbury rechaza hacer más declaraciones, solicita la presencia de un abogado y es arrestado.

Una vez acusado, Stansbury solicita la supresión de todas sus declaraciones hechas con anterioridad a las Advertencias Miranda, así como la evidencia obtenida como resultado de dichas declaraciones. El tribunal de primera instancias declaró no ha lugar la solicitud de supresión, fundamentándose en que Stansbury no estuvo bajo custodia –y por lo tanto no tenía derecho a que se le hicieran las Advertencias Miranda– hasta el momento en que mencionó el sedan americano color turquesa de su compañera. Antes de esa declaración, razonó el tribunal de primera instancia, el foco en la mente del Teniente Johnston ciertamente lo era el otro vendedor de helado y no fue sino hasta que Stansbury hizo referencia al vehículo, que las sospechas del Teniente Johnston se tornaron hacia el acusado. Como señalamos, el jurado condenó a Stansbury por el secuestro, violación y asesinato de la menor.

El Tribunal Supremo de California confirmó la convicción concluyendo, al igual que el tribunal de primera instancia, que Stansbury no estuvo sujeto a un interrogatorio bajo custodia sino hasta que mencionó el vehículo de su compañera. El Tribunal Supremo de los Estados Unidos revocó.

haciendo el interrogatorio piensa o no que el interrogado es un sospechoso. Como único tiene consecuencia es si se lo dice, y esto último es relevante en la medida en que afecte la forma en que una persona razonable en la posición del cuestionado pueda juzgar el espacio que tiene de libertad de acción.[54] **Lo único relevante, señala el Tribunal Supremo, es la evaluación de todas las circunstancias que rodean el interrogatorio y la consideración objetiva de cómo una persona razonable hubiera entendido su situación.** Citamos directamente la expresión del Tribunal:

> Hence, in determining whether a suspect was in custody, courts should examine all of the circumstances surrounding the interrogation, objectively considering "how a reasonable man in the suspect's position would have understood his situation".[55]

De manera que, en Stansbury v. California, *supra*, el Tribunal Supremo "hace hincapié en la naturaleza objetiva" de la privación de libertad de acción que debe sufrir un interrogado, para resolver si éste se encuentra o no bajo custodia en el contexto de las Advertencias Miranda.[56]

Considerando lo resuelto en Stansbury v. California, *supra*, debemos concluir que la determinación del tribunal de instancia con relación a que Millán Pacheco se

---

[54] Stansbury v. California, *supra*, págs. 319, 325.

[55] Íd., pág. 324, citando a Berkemer v. McCarty, 468 U.S. 420, 442, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984). Véase además, State v. Farris, 109 Ohio St. 3d 519 (Ohio 2006)

[56] Chiesa, op. cit., pág. 35.

encontraba bajo custodia, se ajustó al criterio esbozado en el precedente federal. En el caso de autos el foro primario consideró principalmente factores objetivos en el análisis de si el acusado Millán Pacheco se encontraba o no bajo custodia al momento de ser interrogado, analizando cómo éste, como una persona razonable, pudo haber entendido su situación.

Nótese que el foro de instancia describe la forma en que cuatro agentes en dos patrullas oficiales de la policía se personaron a la residencia de Millán Pacheco, cómo lo transportaron en esas patrullas al cuartel, no extendiéndole una citación, sino indicándole que los acompañara. Así, señala la Juez que la forma y manera en que se llevó a cabo el proceso para entrevistar al acusado iba dirigida a "intervenir con un sospechoso".[57] La acepción de la palabra "intervenir" utilizada en la resolución del tribunal de instancia es la de "dirigir, limitar o suspender el libre ejercicio de actividades o funciones".[58] Esa fue la percepción del foro primario al evaluar la prueba.

Finalmente, el tribunal de instancia señala lo siguiente:

> **El factor concluyente para determinar si una persona esta [sic] bajo custodia es si, a la luz de la totalidad de las**

---

[57]   Resolución del Tribunal de Primera Instancia, Apéndice de la Petición de *Certiorari*, pág. 27.

[58] Real Academia Española, Diccionario de la Lengua Española, 1294 (XXI ed., 2001).

> **circunstancias que rodean la interacción, las circunstancias son de tal naturaleza que una persona razonable no se hubiese sentido libre de concluir la entrevista y marcharse, en este caso el acusado fue conducido en la patrulla... la presencia de los agentes de la policía tendió a crear ese ambiente de coacción que destacan aun más la necesidad de las advertencias legales.**[59] (Énfasis nuestro.)

En su sentencia, el foro apelativo intermedio señala que, según se desprende del expediente y los testimonios vertidos en las vistas de supresión de confesión, el aquí peticionario no era sospechoso del delito hasta después de iniciada la entrevista "por lo que era absurdo pensar que los agentes policíacos intentaron intimidarlo o coaccionarlo con el fin de obtener una admisión o confesión de parte".[60] Asimismo, señala que a Millán Pacheco "no se le había restringido su libertad, ya que podía irse del cuartel en cualquier momento".

Ya hemos determinado que, contrario a lo señalado por el Tribunal de Apelaciones, no erró el foro primario al determinar que el aquí peticionario era considerado sospechoso del crimen que se investigaba, al momento de recibir la visita en su residencia del agente Tarafa y sus acompañantes. De igual forma se equivoca el foro apelativo intermedio al determinar que Millán Pacheco no se

---

[59] Apéndice de la Petición de *Certiorari*, pág. 27

[60] Sentencia del Tribunal de Apelaciones, pág. 12, Apéndice de la Petición de *Certiorari*, pág. 414.

encontraba bajo custodia al ser interrogado; ciertamente *de facto*, lo estaba.[61]

No nos cabe duda de que la determinación del tribunal de instancia con relación a que Millán Pacheco, "a la luz de las circunstancias" que rodearon la interacción se encontraba bajo custodia, se sostiene por la prueba. En primer lugar Millán Pacheco pudo razonablemente pensar que no tenía otra opción que acompañar a los agentes de la policía al cuartel, pues nunca se le presentó otra alternativa.[62]

Además, la manera en que Millán Pacheco fue transportado al cuartel de la policía también sostiene la determinación de que éste podía razonablemente entender que se encontraba bajo custodia. Cualquier persona que es buscado en su casa por cuatro oficiales de la Policía y montado en la parte trasera de una patrulla junto a uno de esos policías mientras el otro conduce, y otra patrulla con los otros dos policías los escolta rumbo a un cuartel, pudiera razonablemente pensar que, de requerirlo, los policías no detendrán la marcha y lo devolverán a su residencia. Por último, el interrogatorio a Millán Pacheco se llevó a cabo en el cuartel de la policía, específicamente en un cuarto donde fue ubicado para ser interrogado. Aunque un interrogatorio conducido en un

---

[61] United States v. Hernández, 2006 U.S. Dist. LEXIS 54242, 2006 WL 2242318 (S.D.N.Y. Aug. 3, 2006).

[62] Transcripción de la Vista de Supresión de Confesión, Apéndice de la Petición de *Certiorari*, pág. 246.

cuartel no necesariamente implica que se conduce bajo custodia, de ordinario se estima que así es.[63]

Ante estas circunstancias, el Tribunal de Apelaciones del Octavo Circuito ha señalado la conveniencia de identificar la existencia de algún elemento que pueda actuar en contra o como mitigador de esa atmósfera de restricción o custodia, tal como: si la Policía le dijo al sospechoso que él o ella se encontraban libre apara poderse ir cuando quisiera, si le advirtieron que no estaba obligado a contestar sus preguntas o si llanamente le dijeron que no se encontraba bajo arresto; si la persona no se encontraba restringida en sus movimientos durante la entrevista; y si la persona fue la que inicialmente hizo contacto con la policía o voluntariamente consintió al pedido de ésta.

Ninguno de estos elementos es de por sí solo concluyente, y su alcance debe ser analizado, nuevamente, a la luz de lo que una persona razonable hubiera pensado. Adoptando los elementos propuestos por el Octavo Circuito, no encontramos en el caso de autos ninguno de estos elementos que podamos determinar que claramente mitigaron el ambiente de restricción o custodia al que fue sometido Millán Pacheco. En fin, todas las circunstancias podían fácilmente llevar a una persona razonable a pensar que su libertad de acción le había sido restringida.

---

[63] Oregon v. Mathiason, 429 U.S. 492 (1977).

Concluimos entonces que las determinaciones del foro de instancia con relación a los criterios que esbozamos en Pueblo v. López Guzmán, *supra*, se sostienen por la prueba. Esto es, que el acusado Millán Pacheco era considerado sospechoso del delito investigado y se encontraba bajo custodia desde el mismo momento en que se inició el interrogatorio del Estado relacionado con ese delito. Es indudable entonces que la admisión hecha por Millán Pacheco al expresar "lo maté, yo lo maté" fue correctamente suprimida por el foro de instancia, pues fue hecha en las circunstancias antes descritas y sin habérsele hecho las Advertencias de Miranda.

Ahora bien, como hemos señalado, una vez hecha esa primera admisión por parte de Millán Pacheco, éste fue interrumpido por el agente Tarafa con el objetivo de que no continuara haciendo otra declaración. Cuando el agente Tarafa lee las Advertencias de Miranda al acusado y éste alegadamente señala entender y firma la renuncia a esos derechos, el interrogatorio **continúa de inmediato**, produciéndose una completa confesión. Es con relación a esa confesión que surge como producto de ese interrogatorio que se ha dividido en dos partes -antes e inmediatamente después de las Advertencias de Miranda- que nos corresponde determinar ahora si procede su admisibilidad.

**IV**

***EL caso de Missouri v. Seibert*, 542 U.S. 600 (2004)**

Como explicaremos más adelante, las circunstancias en las que se produce la confesión del peticionario Millán Pacheco en el caso de autos nos obliga a considerar por primera vez lo resuelto por el Tribunal Supremo de los Estados Unidos en el caso de <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004). En <u>Missouri v. Seibert</u>, *supra*, el Tribunal Supremo federal evalúa y rechaza constitucionalmente un protocolo de interrogatorio utilizado por la policía de la Ciudad de Rolla en Missouri, mediante el cual un sospechoso bajo custodia era interrogado primero sin hacerle las Advertencias de Miranda para, una vez éste hacía admisión de algún hecho incriminatorio, hacerle las requeridas Advertencias, conseguir la renuncia a estos derechos y repetir básicamente el mismo interrogatorio.

Como los ocurridos en <u>Stansbury v. California</u>, *supra*, los hechos acontecidos en el caso de <u>Missouri v. Seibert</u>, *supra*, son trágicos y, más aún, inhumanos. La acusada, la Sra. Patrice Seibert tenía un hijo llamado Jonathan de 12 años de edad que sufría de perlesía cerebral.[64] El niño

---

[64] La perlesía o "parálisis cerebral" es una alteración en el desarrollo causada por un daño en el cerebro inmaduro, ya sea antes o después del nacimiento de una criatura. El término agrupa una serie de diferentes condiciones que producen, en mayor o menor grado, problemas de movilidad, entre otros. SER de Puerto Rico, *¿Qué es perlesía cerebral?* (2011), disponible en www.ser.pr/discapacidades/que-es-perlesia-cerebral/ (última visita en agosto de 2011).

falleció mientras dormía y la señora Seibert temió que la acusaran por negligencia, pues el cuerpo del menor mostraba úlceras debido a estar encamado por demasiado tiempo. En vista de lo anterior y en presencia de la Sra. Seibert, dos de sus hijos adolescentes junto a dos amigos de éstos, concibieron un plan para ocultar las circunstancias en que Jonathan había muerto. El plan que ejecutaron fue incinerar el cadáver de Jonathan, incendiando la casa móvil donde vivían con el cuerpo de Jonathan adentro. Pero, para dar la impresión de que no se había dejado a Jonathan solo y desatendido en el momento del incendio, también dejaron en la casa móvil esa noche –dormido por el efecto de unos medicamentos– a Donald Rector, un adolecente retardado mental que vivía con la familia. Donald falleció en el incendio.

Cinco días después, a eso de las 3:00 a.m., la policía arresta a Seibert pero, siguiendo instrucciones específicas del oficial Richard Hanrahan, el agente que ejecuta el arresto no le hace las advertencias de Miranda. Ya bajo arresto, Seibert es transportada al cuartel de la policía donde es dejada sola en un cuarto de interrogatorios por espacio de 15 a 20 minutos. Entonces, el oficial Hanrahan inicia un interrogatorio –sin las Advertencias de Miranda– en el que cuestionaba a Seibert apretando su brazo y diciéndole "Donald también debía morir mientras dormía".

Al cabo de 30 ó 40 minutos de interrogatorio Seibert finalmente admitió que ella sabía que el plan era que Donald muriera mientras dormía. Admitido este hecho, a la Sra. Seibert le fue permitido un descanso de 20 minutos para fumar y tomarse un café. Concluido el receso de 20 minutos, Hanrahan enciende la grabadora, le hace las advertencias de Miranda a Seibert, ésta lee y firma su renuncia a esos derechos y Hanrahan inicia nuevamente el interrogatorio en el que ésta admite nuevamente los hechos.[65]

Por su rol en la muerte de Donald, Seibert fue acusada de asesinato en primer grado y solicitó la supresión de todas las declaraciones hechas durante el interrogatorio. En la vista de supresión de confesión el Oficial Hanrahan testificó que intencionalmente (*"conscious decision"*) había obviado hacerle las advertencias de Miranda a Seibert, haciendo uso de una técnica de interrogatorio que se le había enseñado: preguntas primero,

---

[65] El oficial Hanrahan comenzó esta segunda parte del interrogatorio haciendo mención para el récord de que él y Seibert ya habían estado hablando un poco con relación a lo ocurrido el día de los hechos. Acto seguido, éste señala lo dicho por Steibert en la primera parte del interrogatorio que conforme a lo que ya habían discutido durante el interrogatorio, el día de los hechos se había llegado a un acuerdo o entendido en cuanto a qué debía ocurrir con Donald. Seibert reacciona en la afirmativa. Hanrahan también le pregunta a Seibert si ese acuerdo o entendido ocurrió en la mañana de los hechos, a lo que Seibert también contestó en la afirmativa. Entonces Hanrahan le pregunta a Seibert acerca del contenido de lo que habían acordado esa mañana y ésta señala que el entendido era que si era posible sacar a Donald de la casa móvil, que lo sacarían. Ante esta contestación el Oficial Hanrahan le pregunta qué debía pasar si no era posible sacar a Donald, a lo que Seibert contesta que ella nunca siquiera consideró eso; que ella simplemente supuso que lo podrían sacar. Entonces Hanrahan confronta a Seibert preguntándole si ella ya no le había dicho a él que Donald debía morir mientras dormía, lo que ésta finalmente termina admitiendo nuevamente.

le haces las advertencias y, entonces, repites la pregunta hasta obtener la respuesta que había dado previamente.

El tribunal de primera instancia del estado de Missouri suprimió la admisión hecha por la Sra. Seibert antes de las advertencias de Miranda, pero permitió que se presentaran las respuestas incriminatorias dadas por ésta después de las advertencias. Un jurado encontró culpable a Seibert de asesinato en segundo grado y ésta apeló. La Corte de Apelaciones del Estado de Missouri confirmó el veredicto basado en lo resuelto por el Tribunal Supremo federal en el precedente de Oregon v. Elstad, 470 U.S. 298 (1985).[66]

---

[66]   En Oregon v. Elstad, 470 U.S. 298, 84 L. Ed. 2d 222. 105 S.Ct. 1285 (1985), dos oficiales de la policía acuden a la casa del joven -18 años- Michael Elstad, con una orden de arresto relacionada con un robo que se estaba investigando. Al llegar a la casa, ambos oficiales son recibidos por la madre del joven quien los deja pasar hasta el cuarto de éste, donde se encontraba escuchando música. Los oficiales le piden a Elstad que se vista y que los acompañe a la sala. Uno de los oficiales le pide a la madre del joven que lo acompañe a la cocina y allí le explica que tenían una orden de arresto contra su hijo por un robo contra uno de sus vecinos. Mientras esto ocurría en la cocina, el otro oficial se quedó con Elstad en la sala de la casa en donde, y según el testimonio del propio oficial, le preguntó si sabía la razón por la cual ellos (la policía) se encontraban allí. Elstad le contestó que no sabía y el oficial entonces le preguntó si él conocía a alguien de apellido Gross.  A esto el joven contestó que sí, y que había escuchado que había ocurrido un robo en la casa de esa persona. En ese momento, el oficial le indica su creencia de que Elstad estaba relacionado con dicho suceso, a lo que  el joven, mirándolo, responde "sí, yo estuve allí". Luego de ese hecho, los policías escoltaron a Elstad hasta la parte trasera de la patrulla, en donde lo transportaron hasta el cuartel.
    Ya en el cuartel, Elstad es ubicado en la oficina de uno de los oficiales que hicieron el arresto. Aproximadamente una hora después, ambos oficiales se reúnen con el joven para interrogarlo y por primera vez le leen sus derechos según Miranda. Elstad señala entender sus derechos y que, consciente de éstos, quiere hacer declaraciones de lo ocurrido. Entonces, Elstad procede a dar una confesión completa y detallada de cómo había perpetrado el robo, la que fue finalmente transcrita, iniciada y firmada por éste y ambos oficiales.
    Elstad fue acusado y convicto de robo, utilizando en parte su propia confesión. Sin embargo, la Corte de Apelaciones de Oregon revocó la convicción señalando que la confesión  no debió haber sido admitida como prueba sustantiva en contra del acusado, debido al poco tiempo transcurrido entre la primera admisión y la posterior confesión. No

Al confirmar la convicción de Seibert, el Tribunal Supremo de Missouri distinguió los hechos de ese caso de los que llevaron al Tribunal Supremo federal a revocar la convicción del acusado en Oregon v. Elstad, *supra*. En Elstad el Tribunal Supremo federal había resuelto que la Cláusula de Autoincriminación de la Quinta Enmienda federal no requiere la supresión de una confesión hecha después de una renuncia válida a las advertencias de Miranda, sólo porque la Policía haya obtenido una previa admisión voluntaria antes de hacerse las Advertencias, en ausencia de prueba alguna de coerción real o alguna otra circunstancia que haya minado la capacidad del sospechoso para ejercer su libre voluntad. En ese contexto, el Tribunal Supremo federal determinó que constituiría una extensión no cubierta por Miranda v. Arizona, *supra*, el sostener que una simple falla en administrar las advertencias Miranda corrompe de tal manera el proceso investigativo que una subsecuente renuncia, informada y voluntaria, es inefectiva, por un tiempo indeterminado.[67]

Según Elstad, el que el Estado no provea las advertencias de Miranda cuando las circunstancias lo precisan, no significa que la declaración hecha sin tales advertencias es realmente el producto de la coerción; lo

_____

obstante, el Tribunal Supremo federal revocó señalando que la Cláusula de Autoincriminación de la Quinta Enmienda federal no requiere la supresión de una confesión, hecha después de una renuncia válida a las Advertencias Miranda, sólo porque la policía haya obtenido una previa admisión voluntaria sin las Advertencias Miranda.

[67] Oregon v. Elstad, *supra*, págs. 304-309.

que significa es que los tribunales presumirán que el sospechoso no tuvo la oportunidad de ejercer inteligentemente su derecho a no auto incriminarse.[68] Por ende, los propósitos de la Quinta Enmienda que prohíben el uso de una declaración obtenida bajo coacción, se satisfacen mediante la exclusión como prueba sustantiva de la declaración hecha sin las Advertencias. Así, aunque Miranda requiere que la declaración hecha sin las advertencias sea suprimida, Elstad resolvió que la admisibilidad de cualquier declaración subsiguiente en esas circunstancias dependería únicamente de que ésta se haya hecho de manera voluntaria e inteligente.[69]

Ahora bien, no obstante lo resuelto en Elstad, el Tribunal Supremo del Estado de Missouri revocó la convicción de la Sra. Seibert fundamentándose en que el interrogatorio que se le hizo a ésta fue prácticamente continuo, por lo que las declaraciones hechas después de las advertencias de Miranda y que eran claramente el producto de la primera admisión ilegal, debieron ser suprimidas.[70] De esta forma, distinguió el caso de la Sra. Seibert de las circunstancias de Oregon v. Elstad, *supra*, basado en que en Elstad las Advertencias de Miranda no se habían omitido intencionalmente. Razonó el tribunal que la omisión intencional de no hacerle a Seibert las

---

[68] Íd., pág. 310.

[69] Íd., pág. 309.

[70] State v. Seibert, 93 S.W.3d 700, 701 (Mo., 2002).

Advertencias Miranda, la privaron de la oportunidad de renunciar consiente e inteligentemente. Como corolario de esto, el Tribunal Supremo de Missouri concluyó que en vista de que tampoco hubo circunstancias que parecieran disipar el efecto de la violación de las advertencias de Miranda, la confesión hecha posterior a las Advertencias fue involuntaria y, por ende, inadmisible.[71] Finalmente, el Tribunal Supremo Federal confirmó la sentencia del Tribunal Supremo de Missouri.

V

Como adelantamos, la controversia a la que se enfrentó el Tribunal Supremo federal en Missouri v. Seibert, *supra*, giraba en torno a la utilización por parte de la policía de una estrategia conocida como "pregunta primero" ("*question first*"). Esta estrategia consiste de un interrogatorio que se divide en dos partes: en la primera, la policía deliberadamente se abstiene de proveer las Advertencias de Miranda al sospechoso al inicio del interrogatorio, hasta que éste admite algún hecho que lo incrimine. Entonces, se inicia la segunda parte en la cual se le informa al sospechoso sus derechos en consonancia con lo requerido por Miranda, se le toma la renuncia a esos derechos y se le interroga nuevamente sobre lo ya expresado hasta conseguir una total confesión.

---

[71] Missouri v. Seibert, *supra*, pág. 606.

En Missouri v. Seibert, *supra*, cinco de los jueces que componen el Tribunal encontraron que las circunstancias que tenían ante sí eran distinguibles de las de Oregon v. Elstad, *supra*. Los Jueces Souter, Stevens, Ginsburg y Breyer suscribieron una opinión por pluralidad con la cual concurrió el Juez Kennedy, y mediante la cual confirmaron la supresión de las declaraciones incriminatorias hechas por la acusada Seibert durante la segunda etapa del interrogatorio.[72]

### *La posición de la opinión por pluralidad*

Ahora bien, aunque cinco jueces coincidieron en que las declaraciones de la Sra. Seibert debían ser suprimidas, el caso de Missouri v. Seibert, *supra*, no produjo una opinión mayoritaria. Sólo cuatro de los nueve jueces que componen el Tribunal e intervinieron en el caso coincidieron unánimemente en una misma posición. Los cuatro jueces que coincidieron se constituyeron entonces en una pluralidad de los miembros de ese Foro que, junto a la concurrencia del Juez Kennedy, decidieron finalmente el caso.

Para esta pluralidad de los miembros de dicho Tribunal, el contraste entre Elstad y Seibert deja ver hechos que son relevantes con relación a si las Advertencias de Miranda suplidas a mitad de un interrogatorio pueden ser lo suficientemente efectivas como

---

[72] Missouri v. Seibert, *supra*, págs. 609, 616-617.

para cumplir con su objetivo.[73] Así, basándose en factores objetivos, la opinión por pluralidad sostiene que cuando las Advertencias de Miranda son insertadas a mitad de un interrogatorio que ha sido coordinado y continuo, éstas probablemente inducirán a error al acusado y lo privarán de un conocimiento que es esencial a su capacidad para poder entender la naturaleza de sus derechos y las consecuencias de abandonarlos.[74] En este contexto, el Juez Souter señala que cuando en un interrogatorio se pregunta primero y se advierte después, el asunto de umbral es si sería razonable determinar que, en esas circunstancias, las Advertencias podrían funcionar de manera efectiva, como se requiere en Miranda v. Arizona.[75]

La opinión por pluralidad establece entonces cinco factores objetivos que deben ser considerados al momento de examinar la efectividad de las Advertencias de Miranda introducidas a mitad de un interrogatorio. Estos factores son: **cuán completas y detalladas son las preguntas y las contestaciones en la primera parte del interrogatorio; cuánto se traslapa o se repite el contenido de las**

---

[73] "*The contrast between Elstad and [Seibert] reveals a series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object...*" Íd., pág. 615.

[74] "*Thus, when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'*" Íd., págs. 613-614 (citando a Moran v. Burbine*, supra*, 424).

[75] "*The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as Miranda requires.*" Íd., págs. 611-612.

**declaraciones de la primera parte del interrogatorio en la segunda parte; el momento y el lugar en que termina la primera parte del interrogatorio y comienza la segunda parte; la continuidad del personal de la policía que interroga entre la primera y la segunda parte del interrogatorio; y el grado en el que las preguntas del interrogador tratan la segunda parte del interrogatorio, como una continuación de la primera.[76]**

En vista de lo anterior, la pluralidad de los miembros del Tribunal Supremo federal, junto al Juez Kennedy, determinó que la confesión hecha por Seibert *post* Advertencias de Miranda, debía ser suprimida. Al hacerlo, los cuatro jueces que suscribieron la opinión por pluralidad consideraron los siguientes aspectos objetivos: la primera parte del interrogatorio -pre Advertencias- había sido conducido en el cuartel de la policía y había sido un interrogatorio sistemático, exhaustivo, y manejado psicológicamente. Cuando la policía finalizó el interrogatorio faltaba poco de potencial incriminatorio, si algo, por decir. La segunda parte del interrogatorio –*post* Advertencias- se llevó a cabo en el mismo lugar en donde se llevó a cabo la primera parte, por el mismo oficial de la policía y después de una pausa de apenas 20 minutos. La policía no advirtió a Seibert que las declaraciones incriminatorias hechas por ella en la primera etapa del

---

[76] Íd., pág. 615.

interrogatorio, no podían ser usadas en su contra. Además, desde el inicio de la segunda parte del interrogatorio se hizo referencia a lo hablado en la primera parte, dando así la impresión de que esa segunda parte era meramente una continuación de lo que ya habían estado hablando.

***La opinión concurrente del Juez Kennedy***

Por su parte, en la opinión concurrente, el Juez Kennedy señaló estar de acuerdo con gran parte de lo expuesto en la opinión de la pluralidad de los miembros de ese Foro.[77] Sin embargo, señaló no estar dispuesto a aplicar los parámetros establecidos por la opinión por pluralidad a todo tipo de interrogatorio que constara de dos partes ("*two-stage interview*"), sino que aplicaría una evaluación objetiva sólo a aquellos casos en que se utilice ese tipo de interrogatorio como parte de una **estrategia deliberada** y diseñada por el Estado específicamente para socavar lo establecido en <u>Miranda v. Arizona</u>, *supra*.[78] Además, el Juez Kennedy señaló lo siguiente:

> If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the post-warning statement is made. **Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the**

---

[77] De hecho, el Juez Kennedy describe la opinión por pluralidad como "meticulosa y convincente". Íd., pág. 618.

[78] <u>Missouri v. Seibert</u>, *supra*, págs. 621-622.

> **Miranda waiver.** For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient. (Énfasis nuestro y citas omitidas.)[79]

Como vemos, el Juez Kennedy también señala que si se determina que existe una estrategia deliberada, aquellas declaraciones *post* Advertencias que estén relacionadas con la substancia de las declaraciones *ante* Advertencias tienen que ser suprimidas a menos que se empleen medidas curativas ("*curative measures*") que aseguren que una persona razonable en la posición del sospechoso entendería el significado de las Advertencias de Miranda, y el efecto que conlleva una renuncia a éstas. Entonces, la Opinión Concurrente menciona dos ejemplos de lo que podrían constituir esas "medidas curativas". La primera, la ocurrencia de una interrupción substancial de tiempo y circunstancias entre las dos partes del interrogatorio que permita al juzgador de ordinario concluir que el acusado pudo distinguir los dos contextos y apreciar que el interrogatorio tomo un nuevo giro.[80] Como segunda medida curativa y en la alternativa, el Juez Kennedy señala que se

---

[79] Íd., pág. 622.

[80] Íd.

le debe proveer al acusado una advertencia adicional en la que se le explique la probabilidad de que la declaración pre advertencias sea inadmisible.[81]

Finalmente, en su opinión el Juez Kennedy señala que en aquellos casos en que no se haya utilizado el interrogatorio dual ("*two-stage interview*") como parte de una estrategia deliberada, se deben evaluar según los principios de Oregon v. Elstad, *supra*.[82]

### El precedente de Missouri v. Seibert

"Cuando un Tribunal fragmentado decide un caso y ninguno de los criterios que explica el resultado goza de la aprobación de al menos cinco de los jueces, el racional [*ratio decidendi*] del Tribunal puede ser visto como esa posición adoptada por esos Miembros que concurren con la sentencia por los fundamentos más cercanos".[83] Lo importante entonces es encontrar ese patrón jurídico ("legal standard"), ese denominador común en el que la mayoría del Tribunal sí coincide y que al aplicarlo al caso produce un resultado con el que esa mayoría coincidiría.[84]

---

[81] Íd.

[82] Íd.

[83] Marks v. United States, 430 U.S. 188, 193 (1977). (Citas omitidas y traducción nuestra.)

[84] Planned Parenthood v. Casey, 505 U.S. 833 (1977). Véase también United States v. Williams, 435 F.3d 1148 (9th Cir. 2006); Smith v. Univ. of Wash. Law Sch., 233 F.3d 1188 (9th Cir. 2000).

Considerando lo anterior, un análisis de la opinión por pluralidad y del voto concurrente del Juez Kennedy nos lleva a concluir que un tribunal de primera instancia estaría obligado a suprimir cualquier confesión o declaración incriminatoria hecha en la segunda parte de un interrogatorio –*post* Advertencias– siempre y cuando existan las circunstancias descritas en la opinión por pluralidad de Seibert, y que se pueda determinar que tales circunstancias se dan como parte de una estrategia deliberada por parte del Estado, diseñada específicamente para socavar lo establecido en Miranda v. Arizona, supra. Colegimos esto en vista de que aunque la pluralidad en Seibert v. Missouri estaría dispuesta a suprimir una declaración tanto en circunstancias en que se demuestre una estrategia deliberada por parte del Estado, así como en el caso en que no exista evidencia de tal estrategia, el voto del Juez Kennedy lo limita sólo al primer supuesto. Siendo así, la pauta se circunscribe a ese tipo de circunstancias. A esta misma conclusión han llegado varios de los tribunales apelativos en los circuitos federales.[85] Concluimos así mismo que Missouri v. Seibert, *supra*, constituye entonces una excepción a Elstad v. Oregon, *supra*, en aquellos casos en que se demuestre una estrategia

---

[85] United States v. Williams, *supra*, 1157-1158; United States v. Ollie, *supra*, 1142 (8th Cir. 2006); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006); United States v. Mashburn, 406 F.3d 303, 308-309 (4th Cir. 2005). Véase además, United States v. Kiam, 432 F.3d 524, 532 (3d Cir. 2006); United States v. Stewart, 388 F.3d 1079, 1086-1087, 1090 (7th Cir. 2004); United States v. Briones, 390 F.3d 610, 613-14 (8th Cir. 2004).

deliberada por parte del Estado para socavar <u>Miranda v. Arizona</u>, supra.[86]

### Determinación de la existencia de una estrategia deliberada diseñada específicamente para socavar <u>Miranda v. Arizona</u>

Ahora bien, con relación al requisito que impone el voto concurrente del Juez Kennedy, esto es, la existencia de una estrategia deliberada por parte del Estado diseñada específicamente para socavar las Advertencias de Miranda, su opinión no elabora directrices específicas para llegar a tal conclusión. Ante ese vacío, varios tribunales apelativos de circuitos federales han determinado que en la evaluación de este requisito deberá considerarse la existencia de evidencia objetiva[87] que, a la luz de la totalidad de la circunstancias, respalde la inferencia de que hubo una estrategia deliberada para socavar <u>Miranda</u>.[88]

---

[86] <u>United States v. Capers</u>, 627 F.3d 470 (2d Cir. N.Y. 2010); <u>United States v. Carter</u>, 489 F.3d 528 (2d Cir. N.Y. 2007); <u>United States v. Street</u>, 472 F.3d 1298, 1314 (11th Cir. 2006); <u>United States v. Kiam</u>, *supra*; <u>United States v. Williams</u>, *supra*; <u>United States v. Courtney</u>, *supra*; <u>United States v. Hernandez</u>, 384 F.3d 562, 566 (8th Cir. 2004).

[87] También podría considerarse evidencia subjetiva como ocurrió con el inusual testimonio del policía en el caso de <u>Seibert</u>. No obstante, concurrimos con la observación del Juez Souter en el sentido de que *"the intent of the officer [in Seibert] will rarely be as candidly admitted as it was"*. <u>Missouri v. Seibert</u>, *supra*, pág. 616, escolio Núm. 6.

[88] <u>United States v. Capers</u>, *supra*; <u>Thompson v. Runnel</u>, 621 F.3d 1007 (9th Cir. Cal. 2010); <u>People v. Montgomery</u>, 375 Ill. App. 3d 1120 (Ill. App. Ct. 5th Dist. 2007); <u>United States v. Williams</u>, *supra*, 1158; <u>United States v. Nuñez-Sanchez</u>, 478 F.3d 663, 668-669 (5th Cir. 2007); <u>United States v. Street</u>, *supra*; <u>United States v. Naranjo</u>, 426 F.3d 221 (3d Cir. Pa. 2005). Véanse además, <u>Ross v. State</u>, 45 So. 3d 403 (Fla. 2010); <u>State v. Dailey</u>, 273 S.W.3d 94 (Tenn. 2009); <u>People v. Lopez</u>, 229 Ill. 2d 322 (Ill. 2008); <u>State v. O'Neill</u>, 193 N.J. 148 (N.J. 2007); <u>State v. Farris</u>, 109 Ohio St. 3d 519 (Ohio 2006)..

En específico y con relación a esta evidencia, el Noveno Circuito en United States v. Williams, 435 F.3d 1148 (9th Cir. 2006), ha sugerido la utilización de cuatro de los cinco factores que sugiere la mayoría por pluralidad en Seibert para la determinación de la efectividad de las Advertencias, como factores también para determinar la existencia de una "estrategia deliberada"; esto es, con la excepción de uno, los factores para determinar la existencia de una "estrategia deliberada" y la "determinación de la efectividad" de las Advertencias serían los mismos.[89]

La pauta del Noveno Circuito estableciendo estas circunstancias como factores en la determinación de la existencia de una "estrategia deliberada" ha sido adoptada por otras jurisdicciones a nivel apelativo.[90] Es menester señalar que se establecen estos factores como guías en la determinación de este requisito. Ni Seibert ni ninguno de

---

[89] United States v. Williams, *supra*, pág. 1159.

[90] Thompson v. Runnel, *supra*; United States v. Capers, *supra*; United States v. Carter, *supra*; United States v. Narvaez-Gomez, 489 F.3d 970, 975 (9th Cir. Cal. 2007); United States v. Street, supra. Véase además, People v. Lopez, 229 Ill. 2d 322, 361-362 (Ill. 2008) ("*The Williams court considered the following factors, originally set forth by the Seibert plurality to determine the admissibility of a postwarning statement, as guidelines for assessing evidence objectively: "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements... Within this framework, we look to the objective evidence in this case.");* People v. Angoco, 2007 Guam 1, 27 (Guam Sup. Ct. 2007)("*Because the Seibert concurrence is silent on a method for determining whether the question-first technique was deliberately used to undermine Miranda, we therefore adopt the Ninth Circuit test in Williams discussed above*").

los Circuitos sugieren que los hechos que se analicen tienen que reflejar la totalidad de estos factores.

Considerando lo anterior, y ante el vacío dejado por la opinión concurrente del Juez Kennedy, entendemos conveniente adoptar también tales factores en esta jurisdicción, por entender que éstos se ajustan a los contornos de la opinión de la mayoría por pluralidad y la opinión concurrente del Juez Kennedy en ese caso. Además, para simplificar el análisis final de todas las circunstancias que deberán considerar los tribunales de primera instancia en la determinación de si procede o no la supresión de una declaración en situaciones como las del caso de autos, incluimos como uno de esos factores "el grado en que las preguntas del interrogador tratan la segunda parte del interrogatorio, como una continuación de la primera".

### Peso de la Prueba

La opinión concurrente del Juez Kennedy tampoco establece —como no lo hace la opinión por pluralidad— en cuanto a quién corresponde el peso de la prueba y el *quantum* de ésta requerido en la determinación de si existió o no una estrategia deliberada del Estado para violentar las disposiciones de <u>Miranda</u>. En vista de esto, nos persuade la posición de aquellas jurisdicciones en las que se ha optado por establecer que ante la existencia de un interrogatorio dual corresponde al Estado la carga de establecer, mediante evidencia preponderante, que el

retraso en proveer las advertencias Miranda no responde a una estrategia deliberada. Además, no vemos razón alguna para distinguir este proceso del que hemos exigido al Estado en los casos en que se alega que la renuncia del acusado a sus derechos bajo la cláusula de no autoincriminación no ha sido voluntaria, consciente e inteligente.[91] De manera que, como ha señalado el Tribunal Supremo del Estado de Florida "...corresponde al Estado llevar la carga de establecer que el retraso en proveer las Advertencias Miranda no fue deliberado" ("*...the government bears the burden of establishing that the delay in administering the Miranda warnings was not deliberate*") Ross v. State, 45 So. 3d 403, 427 (Fla. 2010) (Traducción nuestra.)

### *Determinación de la efectividad de las Advertencias*

Una vez se detecta la utilización de una estrategia deliberada para socavar a Miranda, la pluralidad de los miembros del Tribunal Supremo federal en Seibert requiere que se evalúe la efectividad de las advertencias de Miranda insertadas a mitad de ese interrogatorio, de manera que se pueda determinar si la declaración incriminatoria hecha *post* Advertencias es admisible. Para esto, esa pluralidad propone los cinco factores que ya hemos mencionado.

---

[91] Pueblo v. Medina Hernández, *supra*; Pueblo v. Ruiz Bosch, *supra*. Véanse además, United States v. Stewart, *supra*; United States v. Ollie, *supra*. Véase también, Ross v. State, 45 So. 3d 403, 427 (Fla. 2010) ("*...the government bears the burden of establishing that the delay in administering the Miranda warnings was not deliberate*").

Ahora bien, con relación a lo que ha de ocurrir una vez se determine la existencia de una estrategia deliberada, ya vimos que, distinto al método multifuncional que propone la opinión por pluralidad, el Juez Kennedy utilizaría simplemente "medidas curativas" dirigidas a asegurarse que una persona razonable en la posición del sospechoso entendería el significado de las Advertencias Miranda y efecto que conlleva una renuncia a éstas.[92]

Sin embargo, al analizar ambas opiniones detalladamente encontramos que los factores para la "determinación de la efectividad" de las Advertencias que propone la mayoría por pluralidad ciertamente son perfectamente compatibles con las "medidas curativas" que éste propone. Nos explicamos. En la opinión por pluralidad, el Juez Souter señala que la policía no advirtió a Seibert que las declaraciones incriminatorias hechas por ella en la primera etapa del interrogatorio, no podían ser usadas en su contra:

> When the same officer who had conducted the first phase recited the Miranda warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used.[93]

---

[92] Missouri v. Seibert, *supra*, pág. 622.

[93] Íd., pág. 616.

De manera que incluir medidas curativas parece ser algo que la mayoría por pluralidad está dispuesta a considerar como parte del proceso para determinar la admisibilidad de una declaración *post* Advertencia, siempre y cuando las mismas no se limiten a un mero *addendum* formal advirtiendo que una declaración previa no puede ser usada.[94]

Por otro lado, en su razonamiento, el Juez Kennedy admite de manera indirecta que al menos una de las circunstancias que la pluralidad de miembros del Tribunal Supremo federal consideró como factores en la determinación de la efectividad de las Advertencias, tuvo peso en su determinación de suprimir la declaración de la acusada. Ésta es, el grado en que las preguntas del interrogador trataron la segunda parte del interrogatorio, como una continuación de la primera. Así puede deducirse claramente del texto de su Opinión:

> **Further, the interrogating officer here relied on the defendant's prewarning statement to obtain the postwarning statement used against her at trial. The postwarning interview resembled a cross-examination. The officer confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge...** This shows the temptations for abuse inherent in the two-step technique. Reference to the prewarning statement was an implicit suggestion that the mere repetition of the earlier statement was not independently

---

[94] Íd., pág. 617. Véase nota al calce Núm. 7, Opinión del Juez Souter.

incriminating.    The   implicit   suggestion
was false. (Énfasis nuestro).[95]

Además,  y  con  relación  al  cuarto  de  los  factores
propuestos  por  la  opinión  por  pluralidad  (la  continuidad
entre  ambas  partes  del  interrogatorio),  notamos  que  el  Juez
Kennedy  sugiere  como  una  de  sus  "medidas  curativas"  la
ocurrencia  de  una  interrupción  substancial  de  tiempo  y
circunstancias  entre  las  dos  partes  del  interrogatorio.
Esto  evidencia  entonces  que  el  Juez  Kennedy  le  dio  peso,
como  parte  de  su  análisis,  a  la  continuidad  entre  ambas
partes  del  interrogatorio,  esto  es,  el  momento  y  el  lugar
en  que  termina  la  primera  parte  del  interrogatorio  y
comienza  la  segunda.    Considerando  todo  lo  anterior,
dictaminamos  que  ante  la  determinación  de  una  estrategia
deliberada  por  parte  del  Estado  para  socavar  las
Advertencias  de  Miranda  los  tribunales  deberán,  bajo  el
mismo  *quantum*  de  prueba,  evaluar  la  efectividad  de  las
Advertencias  suministradas  por  la  policía,  a  la  luz  de  los
cinco  factores  delineados  por  la  opinión  por  pluralidad  en
Missouri v. Seibert,  *supra*,  y  de  las  "medidas  curativas"
propuestas  en  el  mismo  caso  por  la  opinión  concurrente  del
Juez  Kennedy.[96]

En  conclusión,  el  asunto  se  reduce  a  lo  siguiente:
habiendo  adoptado  los  cinco  factores  para  "determinar  la
efectividad"  de  las  Advertencias  como  los  factores  a  su  vez

---

[95] Íd., pág. 621.

[96] United States v. Williams, *supra*, pág. 1160.

para determinar el requisito de la existencia de una "estrategia deliberada", es obvio entonces que probadas las circunstancias de esta segunda ("estrategia deliberada") quedan a su vez probadas las de la primera ("determinar la efectividad").

**De manera que ante un interrogatorio dual, si el Estado fracasa en su gestión de probar la inexistencia de una estrategia deliberada para socavar Miranda v. Arizona, *supra*, entonces queda probado a su vez la inefectividad de las Advertencias de Miranda provistas al acusado. Por lo tanto, restaría simplemente al tribunal considerar, y al Ministerio Público probar mediante preponderancia de la prueba, la existencia de alguna de las "medidas curativas" propuestas en la opinión concurrente del Juez Kennedy, en cuya ausencia procede la supresión como evidencia sustantiva de la declaración incriminatoria.**

**VI**

El derecho a la no autoincriminación consagrado en la Constitución de Puerto Rico es un derecho fundamental.[97] Como tal, el alcance concedido a tal derecho por el Tribunal Supremo de los Estados Unidos al interpretar la Quinta Enmienda de la Constitución federal, constituye, sea que Puerto Rico se considere como un territorio o como un Estado, "el mínimo de protección que estamos obligados a

---

[97] Pueblo v. Ruiz Bosch, *supra*, pág. 776. Véanse además: United States v. Patane, *supra*, 641 (2004); Miranda v. Arizona, *supra*, 458-459. Ullmann v. United States, 350 U.S. 422, 426 (1956).

reconocer [para nuestra Cláusula análoga] bajo nuestra propia Constitución".[98]

Como ya hemos visto, Missouri v. Seibert, *supra*, es una decisión por pluralidad que constituye un precedente sólo en la medida en que se pueda identificar una estrategia deliberada por parte del Estado de interrogar primero al sospechoso sin hacer las advertencias de Miranda para, una vez éste confiesa, hacerle las advertencias, conseguir la renuncia a sus derechos y repetir básicamente el mismo interrogatorio.

En el caso de autos -y evaluando las circunstancias con la mayor objetividad y pragmatismo judicial- la actuación del agente a cargo de la investigación criminal, el agente Fernando Tarafa, nos convence de la existencia de una maniobra deliberada para ejecutar el esquema repudiado en el tan mencionado precedente federal. En primer lugar, no hay duda que el agente Fernando Tarafa consideraba al aquí peticionario sospechoso del crimen al momento de someterlo al interrogatorio. Asimismo, no tenemos dudas con relación a que la forma en que el agente Tarafa buscó y transportó al peticionario hacia una oficina en el segundo piso del cuartel de la Policía donde se condujo el interrogatorio, tenía la intención y hubiera provocado la

---

[98] Pueblo v. Guerrido López, 179 D.P.R. 950, 963 (2010); Pueblo v. Casanova, 161 D.P.R. 183, 205 (2004) (Sentencia), Voto de Conformidad del Juez Asociado Rivera Pérez. Véase también, Pueblo v. Meléndez Rodríguez, 136 D.P.R. 587 (1994); Pueblo v. Rivera Colón, 128 D.P.R. 672 (1991); Pueblo v. Malavé González, 120 D.P.R. 470 (1988); Pueblo v. Falú Martínez, 116 D.P.R. 828 (1986); Pueblo v. Dolce, 105 D.P.R. 422 (1976).

impresión en cualquier persona razonable de que se encontraba restringido de su libertad.

Por último, estando bajo esas condiciones es que Millán Pacheco fue sometido a un interrogatorio con preguntas expresas por parte del agente investigador con relación a lo que conocía de los hechos. En fin, que el acusado Millán Pacheco se encontraba en calidad de sospechoso del delito que se estaba investigando y bajo la custodia del Estado al ser sometido al interrogatorio en el cual hizo primeramente la admisión y luego la completa confesión incriminatoria. Estas fueron las determinaciones y conclusiones a las que llegó la ilustrada sala de instancia que tuvo ante sí la prueba testifical, criterio con el cual no debemos intervenir, en ausencia de error manifiesto, pasión, prejuicio o parcialidad,[99] pero que además representan el balance más racional, justiciero y jurídico de la totalidad de la evidencia que se desfiló.[100]

### *Millán Pacheco a la luz de Missouri v. Seibert*

Analicemos, entonces, el proceso de la confesión de Millán Pacheco a la luz de los parámetros expuestos en Missouri v. Seibert, *supra*. Con relación a lo **completo y detallado de las preguntas en la primera parte del interrogatorio**", basta con señalar que antes de la

---

[99] Pueblo v. Acevedo Estrada, 150 D.P.R. 84 (2000); Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49 (1991); Pueblo v. Rivero, Lugo y Almodóvar, 121 D.P.R. 454 (1988); Pueblo v. De Jesús Rivera, 113 D.P.R. 817, 826 (1983).

[100] Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172 (1985)

confesión la prueba demostró que el acusado Millán Pacheco estuvo sentado frente al agente Tarafa contestando múltiples preguntas relacionadas a la investigación criminal, por aproximadamente una hora. Según el relato del agente Tarafa, Millán Pacheco le habla y él escribía. En su "mecánica" -como la describió el propio agente Tarafa- éste cuestionó directamente al acusado hasta que, como resultado de una confrontación mediante una pregunta expresa y detallada, Millán Pacheco admitió haber dado muerte a su víctima.

Con relación al **traslapo en ambas partes del interrogatorio** de las declaraciones hechas por Millán Pacheco, no hay duda de que también ocurrió. Según su propia declaración, el agente Tarafa comenzó interrogando a Millán Pacheco en cuanto a lo ocurrido ese día en la finca, hasta que lo confronta y éste admite el crimen. El testimonio del agente Tarafa con relación a esto fue el siguiente:

> Defensa: "*... Mire, entonces sigue hablando usted de la familia, y los otros parientes de la mujer de Ramón, [Millán Pacheco] pero usted lo que estaba era investigando una muerte*".
>
> Testigo [Agente Tarafa]: "*Sí, bueno por eso,*"
>
> Defensa: "*¿Verdad que sí?*"
>
> Testigo [Agente Tarafa]: "*Pero empezamos hablando cosas pues de esa área, pues lo que le dije, ok mira ok, para lo que yo necesito entrevistarte es relacionado al caso de la finca y empezamos a hablar y él empezó a narrarme. Cuando llegó al punto de que él se fue, porque él me dice que el guardia de seguridad pues había llegado y él se había ido, cuando llega a ese punto pues este, ahí*

> *yo le dije: "pero a ti no te vieron ellos
> cuando fueron a la finca"; entonces él ahí
> bajó la cabeza y comenzó a llorar y dijo "yo
> lo maté".*  (Énfasis nuestro.)[101]

Una vez Millán Pacheco admite el crimen y comienza la segunda parte del interrogatorio, éste vuelve a admitir el crimen, ahora en forma de confesión, con los detalles incriminantes que antes no había dicho. Así surge claramente de la declaración jurada prestada por el agente Fernando Tarafa ante el Fiscal Ernesto Quesada Ojeda el 20 de marzo de 2007.[102] En esta Declaración Jurada el agente Tarafa señala todos los detalles que le confesó Millán Pacheco en la segunda parte del interrogatorio.  En ésta, el agente Tarafa señala que Millán Pacheco le expresó que el día de los hechos, a eso de las 7:00 am, éste había llegado al área de la finca donde trabajaba y donde también estaba trabajando ese día su víctima, el Sr. Luis A. León Ramírez.[103]  Esto demuestra que Millán Pacheco en su confesión habla precisamente de lo mismo que había hablado en la primera parte del interrogatorio: de todo lo acontecido ese día en la finca Bocachica.  De manera que en ambas partes del interrogatorio —pre Advertencias y *post* Advertencias— Millán Pacheco cuando menos declara

---

[101] Transcripción  de la Vista Preliminar, Apéndice de la Petición de *Certiorari*, pág. 66.

[102] Véase Declaración Jurada del Agente Tarafa, Apéndice de la Petición de *Certiorari*, pág. 39.

[103] Íd.

ampliamente sobre tres elementos: <u>haber asesinado al Sr. León Ramírez, el día que lo hizo y el lugar</u>.

En cuanto **"[a]l momento y el lugar en que termina la primera parte del interrogatorio y comienza la segunda"**, y la **"continuidad del personal de la policía"**, surge de la prueba que ambas partes del interrogatorio se llevaron a cabo en el mismo lugar, por el mismo policía (el agente Tarafa) y sin que siquiera hubieran trascurrido –como en el caso de <u>Seibert</u>– unos minutos de receso.

Finalmente, **"el grado en el que las preguntas del interrogador trata[ron] la segunda parte del interrogatorio, como una continuación de la primera"**, también se da en este caso. Durante la vista preliminar, el agente Tarafa declaró lo siguiente con relación a lo ocurrido inmediatamente después de la admisión del acusado:

> *Ahí pues yo le hice las advertencias de ley, porque ya empezó como que a hablarme más, yo le dije "pérate, pérate, pérate, no me hables más nada" y le hice las advertencias, y luego de las advertencias pues le dije "si tu quieres", porque él decía que él estaba arrepentido que él no quiso hacer eso, pues él dice que me quiere contar lo que pasó y ahí luego de las advertencias es que él me empieza a contar.[104]*

Como vemos, la transcripción del testimonio del agente Tarafa durante la vista preliminar del caso demuestra que éste estuvo pendiente durante el interrogatorio que le hizo a Millán Pacheco para,

---

[104] Transcripción de la Vista Preliminar, Apéndice de la Petición de *Certiorari*, pág. 66.

inmediatamente el aquí peticionario dijera algo que lo autoincriminara, detenerlo para que lo contara todo nuevamente pero, esta vez, "debidamente advertido". Según el propio Tarafa, luego que el acusado le hiciera la admisión, éste *"empezó como que a hablar[le] más", y* él le dijo *"pérate, pérate, pérate, no me hables más nada".* En ese momento **no hubo pausa** sino sólo para que el acusado fuera "advertido" y luego el agente Tarafa dice que le dijo *"si tú quieres"*, refiriéndose, según puede interpretarse del contexto, a que Millán Pacheco podía <u>continuar hablando</u>. No hay dudas de que la manera en que el agente Tarafa dirigió esa parte del interrogatorio hubiera llevado a cualquier persona razonable a pensar que el que acababa de iniciarse no era un interrogatorio nuevo o distinto, sino una continuación del anterior, en el que el acusado Millán Pacheco acababa de hacer su incriminante admisión.

Por todo lo anterior, concluimos que los cinco factores establecidos por el Tribunal Supremo federal en <u>Missouri v. Seibert</u>, *supra*, se cumplen con suficiente claridad en este caso denunciando, según hemos adaptado ese precedente federal, una estrategia deliberada por parte del Estado para socavar <u>Miranda v. Arizona</u>, *supra*. Por lo tanto, obligatoriamente se cumplieron, a su vez, los factores que establecen la inefectividad de las Advertencias de Miranda administradas al peticionario Millán Pacheco durante su interrogatorio. Por último, no surge de la prueba la ocurrencia de alguna de las medidas

curativas propuestas por el Juez Kennedy que pudiera subsanar la inefectividad de tales advertencias. Concluimos, entonces, que la renuncia del peticionario Millán Pacheco a sus derechos conforme a la Cláusula constitucional de no autoincriminación no fue una informada e inteligente, por lo que no precisa expresarnos con relación a si ésta fue voluntaria.

## VII

En circunstancias como las antes descritas, no podemos entender qué propósito puede tener el que un oficial de la Policía que programa y lleva a cabo un interrogatorio a un sospechoso, deliberadamente opte por no proveerle las advertencias de Miranda desde el mismo instante en que comienza a interrogarlo, **a no ser que intente conseguir esa primera admisión que abra la puerta a una completa confesión.** Peor aún, y como ha señalado la Corte de Apelaciones federal para el Noveno Circuito, una vez un oficial de la Policía ha detenido a un sospechoso y lo somete a un interrogatorio, rara vez existe una razón legítima, si alguna, para retrasar el hacerle las Advertencias de Miranda hasta después que éste ha confesado. Al contrario, la razón más plausible para el retraso es una ilegítima, esta es, la intención del

interrogador de debilitar los efectos de las Advertencias de Miranda.[105]

Como también señala el Tribunal Supremo federal en Missouri v. Seibert, *supra,* pág. 613:

> After all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble.

Ante una estrategia como esa, las Advertencias de Miranda provistas a mitad del interrogatorio con el propósito de conseguir una posterior confesión son, conforme a lo resuelto en Missouri v. Seibert, *supra*, **inadecuadas**, y, por lo tanto, la renuncia al derecho a no autoincriminarse que asiste al ciudadano no es inteligente o bien informada. En casos como éste y conforme al discutido precedente federal, la única manera en que las Advertencias de Miranda pueden constituirse en unas adecuadas y la renuncia del ciudadano una informada en cumplimiento con Miranda v. Arizona, *supra*, es que, **al momento de la admisión se incluya, de manera clara y expresa en las Advertencias, el que nada de lo que la persona ha dicho hasta ese momento puede ni será utilizado**

---

[105] *"Once a law enforcement officer has detained a suspect and subjects him to interrogation ... there is rarely, if ever, a legitimate reason to delay giving a Miranda warning until after the suspect has confessed. Instead, the most plausible reason for the delay is an illegitimate one, which is the interrogator's desire to weaken the warning's effectiveness".* United State v. Williams, *supra*, pág. 1150.

**en su contra, incluyendo la declaración incriminatoria que acaba de hacer; o que ocurra una interrupción substancial de tiempo y circunstancias entre las dos partes del interrogatorio que permitan objetivamente concluir que hubo una renuncia inteligente y voluntaria a los derechos bajo la Quinta Enmienda.** Estas, como hemos visto, no fueron las circunstancias en este caso, por lo que procede que se revoque la sentencia del Tribunal de Apelaciones y se reinstale la decisión del Tribunal de Primera Instancia. Se dictará sentencia de conformidad.

Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

       v.                     CC-2009-919     Certiorari

Ramón Millán Pacheco

    Peticionario

SENTENCIA

San Juan, Puerto Rico, a 9 de agosto de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la sentencia del Tribunal de Apelaciones y se reinstala la decisión del Tribunal de Primera Instancia.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió Opinión disidente a la cual se unen los Jueces Asociados señores Rivera García y Feliberti Cintrón. La Jueza Asociada señora Pabón Charneco no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Recurrido


     v.


Ramón Millán Pacheco          CC-2009-919

    Peticionario


Opinión disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES, a la que se unen los Jueces Asociados señor Rivera García y el Juez Asociado señor Feliberti Cintrón.

En San Juan, Puerto Rico, a 9 de agosto de 2011.

Difiero del análisis en que se basa la opinión mayoritaria para suprimir una de las declaraciones incriminatorias del acusado. Por eso me veo precisado a emitir, respetuosamente, esta opinión.

En esencia, coincido con el análisis de que se debieron hacer las advertencias contra la autoincriminación antes de someter al acusado al interrogatorio. Sin embargo, difiero de la apreciación de que la segunda confesión, vertida luego de explicar al acusado sus derechos, debe suprimirse también. La renuncia a los derechos que hizo el acusado antes de su segunda confesión es válida.

I

Luis A. León Ramírez salió a trabajar de su casa el 4 de marzo de 2007 a su puesto como guardia de seguridad de una finca en Ponce. Nunca más regresó. Su cuerpo apareció un día después con dos impactos de bala, uno en la cabeza y otro en el brazo derecho. Además, evidenciaba golpes en la cabeza.

Como parte de la investigación, la Policía entrevistó a su viuda y a los empleados de la finca en que laboraba el señor León Ramírez, entre ellos, incluyó al acusado aquí peticionario, el Sr. Ramón Millán Pacheco. El agente investigador de la División de Homicidios de la Policía, a cargo de la investigación del asesinato, Fernando Tarafa, gestionó un subpoena para obtener la información que constaba en el expediente de personal del señor Millán Pacheco de la empresa en la que trabajaba, y en cuyas instalaciones ocurrió el asesinato. Así se hizo de una foto y una dirección que supuestamente correspondían al acusado.

El agente Tarafa reconoció que ese proceder no se siguió con ningún otro empleado de la finca que fue entrevistado. Justificó ese curso de acción en que a los demás empleados se les pudo entrevistar en su área de trabajo, pero no al señor Millán Pacheco porque sólo trabajaba un día a la semana, los sábados. Hubiera tenido que esperar varios días más para entrevistarle y al momento de gestionar el subpoena, era el único empleado de la finca que faltaba por entrevistar como parte de la investigación. Apéndice del Recurso, pág. 236.

La Policía acudió a entrevistar al señor Millán Pacheco a la dirección que se obtuvo del expediente de personal, pero ya él no vivía allí. Era la dirección de su madre, Audelina Pacheco Antorgiorgi, quien no precisó el lugar exacto al que su hijo se había mudado. Surge de la transcripción de la vista de supresión de confesión que se celebró el 6 de septiembre de 2007, que la señora Pacheco Antorgiori testificó que desconocía dónde vivía su hijo y el nombre de su compañera consensual. El agente Tarafa le dejó una citación, admitida en evidencia, para que se la entregara a su hijo en cuanto lo viera. Le indicó que lo buscaban por un asunto de un vehículo. Apéndice del Recurso, págs. 154 y 155.

El agente Tarafa admitió que, como parte de la investigación, la viuda le informó que con quien único su esposo había tenido problemas era con el acusado, por una frustrada compraventa de un vehículo. En el incidente, incluso, tuvo que intervenir la Policía. Apéndice del Recurso, pág. 248.

Según el agente Tarafa, luego del esfuerzo infructuoso por conseguir al acusado en la dirección obtenida del subpoena, optó por buscar otra a través del Sistema David del Departamento de Transportación y Obras Públicas, al que la Policía tiene acceso. Obtuvo una dirección correspondiente al Residencial Perla del Caribe en Ponce. Apéndice del Recurso, pág. 239.

A esa dirección acudieron dos vehículos de la Policía, una patrulla y uno color blanco, entre los que se distribuyeron cuatro agentes. Tras tocar a la puerta, abrió Jannette Rivera Torres, con quien convivía el señor Millán Pacheco. En la vista de supresión de confesión del 6 de septiembre de 2007, la señora

Rivera Torres declaró que los agentes procuraron por el señor Millán Pacheco, quien habló con ellos unos minutos antes de ir al cuarto para cambiarse de ropa. En esos momentos vestía pantalones cortos y estaba descamisado. Ningún agente lo acompañó al cuarto. Rivera Torres admitió que tampoco vio que lo esposaran, pero que el señor Millán Pacheco se fue con los agentes rumbo al cuartel. Apéndice del Recurso, págs. 173-174.

El agente Tarafa describió en la vista de supresión de evidencia de 9 de octubre de 2007 que fueron al apartamento del Residencial Perla del Caribe, y exhortaron al señor Millán Pacheco que les acompañara al cuartel para entrevistarle porque era la última persona que faltaba por interrogar sobre ese caso. Además, el agente indicó que prefirió entrevistar al acusado en el cuartel porque consideró inadecuado el apartamento, ya que el residencial es un lugar de alta incidencia criminal. Apéndice del Recurso, pág. 246.

Una vez en el cuartel, el agente Tarafa alegó que comenzó su acercamiento con una conversación con el ahora acusado sobre el barrio Sabanetas, de conocidos que podían tener en común, de que la exesposa de Millán Pacheco vivía allí y de la pensión alimentaria que tenía que pagar a sus hijos. Apéndice del Recurso, pág. 66. En esos temas, indicó, invirtieron aproximadamente una hora. Luego comenzó la entrevista con preguntas sobre lo que hizo el Sr. Millán Pacheco el 3 de marzo de 2007, un día antes del asesinato, que había sido también su día de trabajo más reciente. El ahora acusado declaró que el guardia de seguridad de la finca lo vio salir al terminar la jornada. Pero el agente Tarafa le señaló que el guardia dijo en

una entrevista que no le había visto ese día. Ese fue el detonante para la admisión del acusado, que se dio en medio de llanto. Apéndice del Recurso, págs. 66 y 260-261.[106]

Al momento de hacer esa admisión, no se le habían leído los derechos al señor Millán Pacheco. Sin embargo, el agente de la División de Homicidios aseguró que al escuchar las expresiones incriminatorias, inmediatamente le pidió que se detuviera e hizo las advertencias de ley. Apéndice del Recurso, pág. 261.

Luego de leer los derechos al señor Millán Pacheco, y permitirle que los leyera del papel en que estaban escritos, el ahora acusado inició cada una de las seis advertencias contenidas en el documento.[107] También contestó con un "sí",

---

[106] La transcripción de la Vista Preliminar del 25 de junio de 2007 en que testificó el agente Tarafa, Apéndice del Recurso, pág. 66 lee como sigue:

"Testigo: Pero empezamos hablando cosas pues de esa área, pues lo que le dije, ok mira ok, para lo que yo necesito entrevistarte es relacionado al caso de la finca y empezamos a hablar y el me empezó a decir a la hora que él había llegado a trabajar a la finca. Y empezó a narrarme. Cuando llegó al punto de que él se fue, porque él me dice que el guardia de seguridad pues había llegado y él se había ido, cuando llega a ese punto pues este, ahí yo le dije pero a ti no te vieron ellos cuando fueron a la finca, entonces él ahí bajó la cabeza y comenzó a llorar y dijo "yo lo maté". Ahí pues le hice las advertencias de ley, porque ya empezó a hablarme más, yo le dije [es]pérate, [es]pérate, [es]pérate, no me hables mas nada y le hice las advertencias, y luego de las advertencias pues entonces le dije si tú quieres, porque él decía que él estaba arrepentido que él no quiso hacer eso, pues él dice que me quiere contar lo que pasó y ahí luego de las advertencias es que él me empieza a contar…".

[107] El documento expresa:

"Advertencias que deben hacerse a un sospechoso o acusado. Usted está aquí como sospechoso o presunto acusado, antes de hacerle preguntas quiero advertirle sobre sus derechos.
   1. Usted tiene derecho a permanecer callado y a no declarar.
   2. Cualquier cosa que usted diga puede ser usada en su contra.
   3. Usted tiene derecho a hablar con un abogado para que le aconseje antes de hacerle cualquier pregunta y además dicho abogado puede acompañarlo durante el interrogatorio.

escrito con su puño y letra, a la pregunta de si había entendido lo que le explicaron y con otro "sí" a la pregunta de que, a pesar de ello, deseaba declarar. Apéndice del Recurso, pág. 83.

Paso seguido, Millán Pacheco continuó la confesión de cómo mató al señor León Ramírez, dónde dejó su cadáver, dónde abandonó y quemó el vehículo objeto de la controversia, y dónde ocultó el arma de fuego. Incluso, en el transcurso de las siguientes horas de la tarde y la noche, el señor Millán Pacheco llevó a agentes de la Policía al lugar donde escondió el arma, en la casa de los padres de la señora Rivera Torres, y al lugar donde se encontraba el vehículo quemado. Vista Preliminar 25 de junio de 2007, Apéndice del Recurso, págs. 69-73; Vista de supresión de confesión, Apéndice del Recurso, págs. 291-302.

Mientras Millán Pacheco aún se encontraba en el cuartel de la Policía, la madre de su compañera, María Torres Santiago, acudió al lugar a petición de su hija y procuró por él. No lo pudo ver en ese momento porque ya se lo llevaban rumbo a la casa del compañero de Torres Soto, donde había escondido el arma. Fue en esa casa donde pudo verle. Apéndice del Recurso, págs. 207-209.

Por su parte, la señora Rivera Torres pudo verle en el cuartel unas dos horas después. Millán Pacheco no estaba

---

4. Si usted no puede pagar un abogado le conseguiré uno antes de interrogarlo, libre de costo alguno, si así lo desea.

5. Si usted se decide a contestar mis preguntas sin estar asistido por un abogado, puede negarse a contestar cualquier pregunta y en cualquier momento puede dejar de contestar y solicitar asistencia legal.

6. Su declaración tiene que ser libre, voluntaria y espontánea y no se puede ejercer presión, ni amenaza, ni coacción para obligarlo a declarar.

A [sic] entendido lo que le he explicado?

Desea usted declarar?"

esposado. Aunque se veía triste, no le dijo que le hubieran golpeado ni maltratado. Apéndice del Recurso, págs. 174-177 y 183. También pudo llevarle comida en dos ocasiones durante ese día y el siguiente.

Los cargos se presentaron el 9 de marzo de 2007, porque, según el agente Tarafa, el fiscal que se haría cargo del caso no estaba disponible el día después de la confesión, el 8 de marzo de 2007. El agente añadió que las pruebas científicas que identificarían el cadáver, en proceso de descomposición, tampoco estaban disponibles. Al señor Millán Pacheco se le mantuvo detenido en el cuartel desde la noche de su confesión hasta la presentación de los cargos el 9 de marzo de 2007. Apéndice del Recurso, págs. 305-309.

Luego de presentadas las acusaciones, la defensa solicitó que se suprimiera todo lo que Millán Pacheco confesó, y la evidencia que se consiguió a raíz de sus declaraciones. Alegó que se obtuvieron en contravención de sus derechos constitucionales. El Tribunal de Primera Instancia accedió a suprimir la evidencia el 25 de abril de 2008. En cambio, el Tribunal de Apelaciones revocó el 23 de septiembre de 2009.

El peticionario acudió ante nos mediante moción en auxilio de jurisdicción y *certiorari* para que paralizáramos la vista con antelación al juicio, programada para el 19 de enero de 2010. Accedimos a su solicitud y el 15 de enero de 2010 expedimos el auto.

II-A

La Quinta Enmienda de la Constitución de Estados Unidos, Emda. V, Const. EE.UU., L.P.R.A., Tomo I, indica que ninguna persona será compelida a declarar contra sí misma en casos criminales ni será privada de su libertad sin el debido proceso de ley. Esas protecciones se extendieron a las acciones estatales a través de la Decimocuarta Enmienda, Emda. V., Const. EE.UU., L.P.R.A., Tomo 1.

Similarmente, la Sec. 11 de la Constitución de Puerto Rico señala que "[n]adie será obligado a incriminarse mediante su propio testimonio y el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra. Art. II, Sec. 11, Const. P.R., L.P.R.A. Tomo 1. La Constitución, en su Sec. 7, también prohíbe que se prive a una persona de su libertad sin el debido proceso de ley. Art. II, Sec. 7, Const. P.R., L.P.R.A. Tomo 1.

El debido proceso de ley protege contra las confesiones obtenidas en contra de la voluntad del declarante. Las confesiones compelidas mediante coacción física o psicológica son inadmisibles en los procedimientos penales por falta de confiabilidad. E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1993, Vol. I, Sec. 2.1, pág. 56; W.E. Ringel, Searches & Seizures, Arrests and Confessions, 2da ed., Minnesota, Thompson West, 2010, Vol. 3, Sec. 24:2, pág. 24-4.[108]

---

[108] Se ha dicho que las confesiones obtenidas en violación del derecho a la autoincriminación pueden utilizarse para fines de impugnación porque el rechazo del ordenamiento obedece a razones de política pública y no de confiabilidad. Chiesa Aponte, op cit, Sec. 2.1, pág. 56.

Las confesiones vertidas durante interrogatorios bajo custodia hechos por oficiales del orden público se presumen producto de la coerción, y las confesiones obtenidas mediante ellos son una forma de autoincriminación compelida. Ringel, _supra_, Sec. 24:1, pág. 24-2. Para neutralizar ese ambiente coercitivo, el Tribunal Supremo federal determinó en _Miranda v. Arizona_, 384 U.S. 346 (1996), que una acusación no puede basarse en declaraciones, inculpatorias o exculpatorias, obtenidas del interrogatorio bajo custodia de un acusado a menos que se demuestre que se tomaron ciertas salvaguardas procesales para hacer efectivo su derecho a la no autoincriminación. _Miranda v. Arizona_, _supra_, pág. 444.

En _Miranda v. Arizona_, _supra_, se atendieron cuatro casos distintos de personas interrogadas por oficiales del orden público realizados en cuartos en los que se les mantuvo incomunicados del mundo exterior, en una atmósfera coercitiva dominada por la policía. En todos los casos se obtuvieron declaraciones incriminatorias sin que se les dieran las advertencias sobre sus derechos constitucionales. _Miranda v. Arizona_, _supra_, pág. 445.

> Sostenemos que cuando un individuo es puesto bajo custodia, o de otra forma privado significativamente de su libertad y es sujeto a interrogatorio, se pone en peligro el privilegio contra la autoincriminación. Se tienen que emplear ciertas salvaguardas procesales para proteger el privilegio y, a menos que se adopten otras medidas completamente efectivas para notificar a la persona de su derecho a guardar silencio y asegurar que el ejercicio de ese derecho sea escrupulosamente honrado, se requerirán las siguientes medidas. El individuo debe ser advertido, antes de cualquier interrogatorio, que tiene derecho a permanecer en silencio, que todo lo que diga puede ser utilizado en su contra en un tribunal, que tiene

el derecho a la presencia de un abogado y que si no puede pagarlo, se le asignará uno antes de cualquier interrogatorio si lo desea. Luego de que se den estas advertencias, el individuo puede, consciente e inteligentemente, renunciar a esos derechos y acordar contestar preguntas o hacer declaraciones. Pero, a menos y hasta que esos derechos y renuncias sean demostradas por el Estado en el juicio, ninguna evidencia obtenida como resultado de un interrogatorio podrá utilizarse en su contra.

Miranda v. Arizona, supra, págs. 478-479. (Traducción nuestra.)

Así pues, basados en este precedente, hemos reiterado que una confesión es inadmisible en evidencia, por violar el derecho contra la autoincriminación, cuando se satisfacen todos los requisitos siguientes: (1) que la investigación ya se había centralizado sobre la persona en cuestión y ésta sea considerada como sospechosa; (2) que el sospechoso se encontraba bajo la custodia del Estado; (3) que la declaración fue producto de un interrogatorio realizado con el fin de obtener manifestaciones incriminatorias, y (4) que no se le advirtió sobre los derechos constitucionales que nuestro ordenamiento le garantiza antes de declarar. Pueblo v. Viruet Camacho, 173 D.P.R. 563, 574 (2008); Pueblo de Puerto Rico v. López Guzmán, 131 DPR 867 (1992)(citas y énfasis omitidos). Véase además, O. E. Resumil, Derecho procesal penal, New Hampshire, Equity, 1990, Tomo 1, Sec. 14.3, pág. 349.

Las protecciones de Miranda sólo se activan en la etapa adversativa de la investigación, es decir, cuando ésta ya no es una general sino centrada en uno o más sospechosos. En ese momento, aunque no haya dado comienzo formal la acción judicial que activa la Enmienda Sexta y el derecho a asistencia de abogado, la relación sospechoso-gobierno es ya adversativa.

Chiesa Aponte, op cit., pág. 83.

Desde Escobedo v. Illinois, 378 U.S. 478 (1964), se reconoció que a una persona deben informársele sus derechos desde el momento en que pasa a ser sospechoso. Esto ocurre cuando una investigación deja de ser general para centrarse en una o más personas que se han puesto bajo custodia y se someten a un interrogatorio dirigido a extraer declaraciones incriminatorias. Escobedo v. Illinois, supra, 490-491. Véase, además, Rivera Escuté v. Delgado, 92 D.P.R. 765, 773-774 (1965).

Ringel, supra, destacó que, luego de Miranda v. Arizona, supra, el Tribunal Supremo de Estados Unidos ha adoptado una posición más formalista sobre cuándo deben hacerse las advertencias. Describe que se ha erosionado el énfasis al elemento de coerción.

> El Tribunal Supremo ha dejado claro que custodia tiene que interpretarse en un sentido formal. Sólo cuando un sospechoso está bajo custodia, un equivalente aproximado a un arresto, aplican las advertencias de Miranda.
>
> Mientras el Tribunal Supremo ha enfatizado un acercamiento formalista de Miranda, las cortes inferiores continúan analizando si "custodia" existe basado en la presencia o ausencia de factores que contribuyen a un ambiente coercitivo…

Ringel, op cit., Sec. 27:2, pág. 27-4. (Traducción nuestra.)

Para saber si alguien se encuentra bajo custodia, para propósitos de Miranda, se debe indagar si se trata de un arresto formal o una restricción a la libertad a un grado comparable al de un arresto formal. Minnesota v. Murphy, 465 U.S. 420, 430 (1984); California v. Beheler, 463 U.S. 1121, 1125 (1983); Pueblo v. Álvarez, 105 D.P.R. 475, 478 (1976).

A esos propósitos, en Yarborough v. Alvarado, 541 U.S. 652 (2004), se avaló el siguiente análisis: primero, determinar cuáles fueron las circunstancias que rodearon el interrogatorio; y segundo, si dadas esas circunstancias, una persona razonable se habría sentido en libertad de irse. Una vez se tiene ese escenario, el tribunal debe analizar si ocurrió un arresto o una

restricción a la libertad de movimiento, similar a un arresto.
Yarborough v. Alvarado, supra, pág. 663.

Al abundar en el criterio de una restricción a la
libertad que constituye un arresto, el Tribunal Supremo de
Estados Unidos ha señalado desde Oregon v. Mathiason, 429
U.S. 492 (1997), que cualquier entrevista a un sospechoso
de un crimen por parte de un policía tendrá aspectos
coercitivos, simplemente por el hecho de que se trata de un
oficial del sistema del orden público que, en última
instancia, puede provocar que se presenten cargos contra el
sospechoso. Sin embargo, ese hecho aislado no
necesariamente transforma el interrogatorio en uno que
requiera de las advertencias de Miranda. California v. Beheler, 463
U. S. 1121, 1125 (1983); Oregon v. Mathiason, supra, pág. 495.
En Stansbury v. California, 511 U.S. 318 (1994), se
precisó que para determinar si se está bajo custodia para
los propósitos de las advertencias de Miranda no es
relevante la visión subjetiva que tenga el policía
interrogador sobre si la persona entrevistada es
sospechosa del delito investigado. Es decir, no importa si
el policía cree que el interrogado es sospechoso. Como las
advertencias de Miranda se confeccionaron para neutralizar
el efecto coercitivo que pudiera tener un interrogatorio
bajo custodia por parte de un agente del Estado, lo
determinante no es lo que piense el policía, sino el
escenario objetivo en que se dio el interrogatorio.
Stansbury v. California, supra, págs. 324-325. El análisis
del escenario objetivo tiene que considerar si el
entrevistado era menor de edad, pues recientemente el
Tribunal Supremo federal señaló que éstos son más
susceptibles a la coacción que los adultos. J.D.B. v.
North Carolina, 564 U. S. ____ (2011).
Además de un sospechoso bajo custodia, para que se activen
las protecciones de Miranda tiene que darse un
interrogatorio iniciado por parte de un agente del orden
público. Resumil explica que hay diferentes tipos de
interrogatorios:

> El testifical, cuyo propósito es demostrar la
> existencia de unos hechos y/o la participación en
> ellos de una o varias personas; el informativo,
> una entrevista formal cuyo propósito es obtener
> información necesaria para orientar la
> investigación y el inculpatorio, el cual se
> dirige al indiciado de delito con el fin de tener
> confesiones o admisiones incriminatorias.

Resumil, op cit., Sec. 14.3, pág. 350. Las advertencias de
Miranda van dirigidas al interrogatorio inculpatorio.
En Rhode Island v. Innis, 446 U.S. 291, 300-302
(1980), el Tribunal Supremo de Estados Unidos concluyó que

el interrogatorio que activa las advertencias de Miranda es el interrogatorio expreso o su equivalente funcional. Se refiere a palabras o acciones que la policía, razonablemente, debe saber que extraerán una respuesta incriminatoria del sospechoso. Esto último se enfoca más en la percepción del sospechoso que en la intención del policía. Sin embargo, la policía no será responsable por los resultados no previsibles de sus palabras o acciones. Rhode Island v. Innis, supra.

En un caso cuyos hechos tuvieron lugar antes de que se publicara Miranda v. Arizona, el Tribunal Supremo federal expresó que la omisión en advertir del derecho a permanecer en silencio y del derecho a abogado, no es en sí mismo, una actuación coercitiva. Es un elemento relevante para establecer el escenario en que se pudo ejercer la coacción que produjo la confesión. Procunier v. Atchley, 400 U.S. 446, 453-454 (1971). Esta visión ha servido para que cortes inferiores consideren, aun en hechos posteriores a Miranda, que la omisión en dar las advertencias al sospechoso es sólo un elemento más en la evaluación de la voluntariedad del declarante. Ringel, supra, Sec. 25:10, pág. 25-49.

Por ejemplo, el Tribunal de Apelaciones para el Sexto Circuito, ha señalado que es insuficiente argumentar que una declaración es coaccionada e involuntaria meramente porque no mediaron las advertencias de Miranda. Concluyó que si la confesión se obtuvo de forma voluntaria, es admisible aunque se hayan omitido las advertencias de Miranda inicialmente. U.S. v. Crowder, 62 F. 3d 782, 786 (6to Cir. 1995).

Al mismo tiempo, una declaración incriminatoria vertida antes de que se provean las advertencias de Miranda no es óbice para que se admita una segunda declaración incriminatoria, luego de hechas las debidas advertencias. Si la primera declaración no fue fruto de tácticas coercitivas por parte de la policía, suprimir esa declaración es una extensión no deseada de Miranda. Oregon v. Elstad, 470 U.S. 298, 309 (1985).

> La pregunta relevante es si la segunda declaración es voluntaria. El juzgador de los hechos tiene que examinar todas las circunstancias y el curso de acción de la conducta de la Policía con relación al sospechoso para evaluar la voluntariedad de sus declaraciones. El hecho de que haya decidido hablar luego de las advertencias es altamente probativo.

Oregon v. Elstad, supra, pág. 318. (Traducción nuestra.) En ese caso, el Tribunal Supremo descartó extender la doctrina del "fruto del árbol ponzoñoso", aplicable a las violaciones de la Cuarta Enmienda de la Constitución federal, sobre el debido proceso de ley, a la omisión en

dar las advertencias de Miranda, que se fundamentan en la Quinta Enmienda. A esos efectos, expresó que expandir esta doctrina "malinterpreta las protecciones que ofrecen las advertencias de Miranda" y, por lo tanto, también malinterpreta las consecuencias de omitirlas. Oregon v. Elstad, supra, pág. 304. (Traducción nuestra.) Véase además, U.S. v. Patane, 542 U.S. 630, 642 (2004).

En Bryant v. Vose, 758 F.2d 364, 366-367 (1er Cir. 1986), el Tribunal de Apelaciones para el Primer Circuito federal señaló que, cuando se omiten las advertencias de Miranda antes de una primera confesión voluntaria, prestada sin tácticas impropias por parte de la Policía, una segunda declaración incriminatoria podría ser admisible si también es voluntaria. Para ello, tendrían que haberse provisto las advertencias antes de la segunda confesión y obtenido la declaración en ausencia de coacción.

Más aun, el Tribunal Supremo federal llegó a admitir en evidencia una declaración incriminatoria posterior a una hecha bajo un claro escenario de violencia. Esto sucedió en Lyons v. Oklahoma, 322 U.S. 596 (1944). A pesar de que este caso se resolvió antes que Miranda v. Arizona, se citó con aprobación y se incluyó en el análisis de Oregon v. Elstad, supra, pág. 311-312, —resuelto después de Miranda— aunque se distinguió por las particularidades en los hechos de cada uno. En Oregon v. Elstad se concluyó que no medió coacción en la primera declaración incriminatoria.

La opinión disidente del Juez Brennan en Oregon v. Elstad, supra, pág. 318, entre otras cosas, criticó que la mayoría estuviera dispuesta a admitir una segunda declaración aunque la primera se obtuvo en violación a las advertencias de Miranda, porque consideró que la omisión en informar los derechos es una táctica impropia en sí misma. El Tribunal Supremo rechazó esa conclusión, similar a la que la mayoría parece adoptar hoy. No obstante, el Juez Brennan subrayó que se debe diferenciar la posible admisibilidad de una confesión posterior a una vertida en violación de Miranda, como la que favoreció la mayoría, de una como la obtenida en Lyons, supra, en que se desfiló evidencia de que el acusado fue torturado previo a su segunda declaración. "A la luz de la madurez de nuestros escrúpulos en contra de este tipo de prácticas durante los pasados 40 años, creo que ese resultado sería imposible hoy día". Opinión disidente del Juez Brennan, Oregon v. Elstad, supra, nota 25. (Traducción nuestra.)

> Así, pues, en situaciones como éstas —admisión inicial voluntaria pero sin las advertencias, seguida de admisión posterior tras las advertencias de rigor— el criterio rector para determinar la admisibilidad de la última admisión es el de voluntariedad.

Chiesa, op cit., Sec. 2.3, pág. 103.
El análisis sobre la voluntariedad requiere la evaluación de la totalidad de las circunstancias. W.R. LaFave, y otros, Criminal Procedure, 3ra ed., Minnesota, Ed. Thompson West, 2007, Sec. 6.2(c), Tomo 2, pág. 616.

La interpretación que se ha dado al llamado análisis de la totalidad de las circunstancias es que ningún factor particular determina la supresión de una confesión. Ese análisis incluye la conducta de la Policía dirigida a obtener la declaración incriminatoria y las características del interrogado que lo hacen susceptible a coerción. Ringel, op cit., Sec. 24:2, pág. 24-6.

En contraste, sí tienen que suprimirse las declaraciones previas y posteriores a Miranda cuando se obtengan como parte de un plan preconcebido para forzar la posterior admisión luego de explicados los derechos. En Missouri v. Seibert, 542 U.S. 600 (2004), el Tribunal Supremo prohibió una práctica en que la Policía del Estado tenía un protocolo para interrogar intencionalmente a los sospechosos sin leerles las advertencias. Luego, se les instruía sobre las advertencias para repetirles las mismas preguntas. El propósito era forzar al declarante a repetir las declaraciones incriminatorias luego de las advertencias para que fueran admisibles. Era un plan preconcebido para, intencionalmente, evadir las protecciones de Miranda.
Luego de contrastar los hechos entre Elstad v. Oregon, supra, y Missouri v. Seibert, supra, una pluralidad del Tribunal Supremo federal enumeró varios factores para determinar si, en casos como éstos, las advertencias de Miranda, vertidas entre medio de dos confesiones, son efectivas al punto de hacer admisible la segunda confesión. Los cinco factores son: (1) lo completo y detallado de las preguntas y respuestas del primer interrogatorio; (2) el traslapo del contenido entre ambas declaraciones; (3) el tiempo y el escenario del primer y segundo interrogatorio; (4) la continuidad del personal policiaco; y (5) el grado en que quien interroga trata el segundo interrogatorio como una continuación del primero. Missouri v. Seibert, supra, pág. 615-616.

B

A pesar de que el derecho a la no autoincriminación es fundamental, el proceso penal admite su renuncia. Pueblo v. Rivera Nazario, 141 D.P.R. 865, 888 (1996); Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 775 (1991); Pueblo en Interés del Menor JABC, 123 D.P.R. 551, 561 (1989). En Miranda v. Arizona, supra, pág. 444, se estableció que la renuncia a este derecho tiene que ser voluntaria, consciente e inteligente. La renuncia se

define como el "abandono intencional del derecho conocido". Resumil, op cit., Sec. 14.10, pág. 358.

Una renuncia es voluntaria cuando no medió intimidación, coacción ni violencia. Es consciente e inteligente cuando al sospechoso se le informó, de forma apropiada, del derecho a la no autoincriminación y de que todo lo que diga puede usarse en su contra, y se le hicieron las demás advertencias de Miranda. Pueblo v. Viruet Camacho, supra, 573. Pueblo v. Rivera Nazario, supra, págs. 888-889; Pueblo v. Ruiz Bosch, supra, págs. 775-776; Pueblo en Interés del Menor JABC, 123 D.P.R. 551, 561-562 (1989).

El análisis aplicable a la voluntariedad de una confesión es el de la totalidad de las circunstancias. El peso de la prueba recae en el Ministerio Público. Pueblo v. Rivera Nazario, supra, pág. 889; Pueblo v. Ruiz Bosch, supra, pág. 776. Se tiene que presentar prueba detallada sobre las advertencias específicas que se hicieron y las circunstancias imperantes al momento de la confesión. Pueblo v. Ruiz Bosch, supra.

En Berghuis v. Thompkins, 560 U.S.___, 130 S. Ct. 2250 (2010), el Tribunal Supremo extendió a la Quinta Enmienda de la Constitución de Estados Unidos el requisito de que toda renuncia al derecho a la no autoincriminación debe hacerse de forma inequívoca, anteriormente aplicable a los derechos de la Sexta Enmienda de la Constitución. Berghuis v. Thompkins, supra, 2260.

Entre las razones que enumeró el Tribunal Supremo federal para adoptar ese estándar se encuentra la conveniencia de un criterio objetivo que evite las dificultades probatorias y provea una guía a la Policía de cómo proceder ante la ambigüedad. Así, destaca Berghuis v. Thompkins, se evitaría la supresión de confesiones voluntarias producto de renuncias confusas en que no se puede descifrar la intención del declarante, con el efecto que ello tiene sobre el interés de la sociedad en perseguir la actividad criminal.

En resumen, se entiende que un sospechoso que recibió y entendió las advertencias de Miranda y no invoca sus derechos renuncia al derecho de permanecer en silencio

cuando hace una declaración no coaccionada a la Policía. <u>Berghuis v. Thompkins</u>, <u>supra</u>, pág. 2264.

III

A

El señor Millán Pacheco pide la supresión de sus declaraciones incriminatorias y de toda la evidencia que de ellas se obtuvo. Para ello, debemos analizar primero si en este caso se cumplen los requisitos que ha detallado el ordenamiento para hacer obligatorias las advertencias de <u>Miranda</u>. Luego, debemos analizar si la instrucción de las advertencias que se dio previo a la segunda parte de la confesión, confiere validez a las declaraciones incriminatorias posteriores. Para ello, tenemos que embarcarnos en el análisis de la voluntariedad de la segunda confesión.

El acusado asegura que él era un sospechoso al momento de hacérsele la entrevista, que estaba bajo custodia y era sometido a un interrogatorio. Los tres son los requisitos que activan las protecciones de <u>Miranda</u>, y provocan que, en ausencia de una instrucción sobre sus derechos, se supriman las declaraciones si se van a usar como prueba de cargo.

El señor Millán Pacheco insiste en que el agente Tarafa lo tenía por sospechoso al momento de buscarlo en su casa. Sostiene que tenía información del incidente ocurrido entre él y la víctima, con relación al vehículo que quemó luego del asesinato. Además, como lo tenía como sospechoso, gestionó un subpoena.

Sin embargo, según <u>Stansbury v. California</u>, <u>supra</u>, lo que el agente investigador piense sobre si el acusado es o no sospechoso no es relevante para determinar si eran requeridas las advertencias de <u>Miranda</u>. Lo relevante es el escenario objetivo en que se dio el interrogatorio.

Las circunstancias objetivas en que la Policía buscó y entrevistó al señor Millán Pacheco presentan un escenario complejo, que en ciertas instancias presenta elementos de coacción. Al evaluarse la totalidad de las circunstancias, se debe concluir que el señor Millán Pacheco era sospechoso para los propósitos de Miranda.

Al señor Millán Pacheco lo fueron a buscar a su casa cuatro agentes, distribuidos en dos patrullas de la policía. Se lo llevaron para el cuartel para entrevistarle sobre un caso de asesinato. Se le detuvo esa misma noche y no regresó más a su hogar.

Por otro lado, nada en el expediente controvierte la versión del agente Tarafa de que el señor Millán Pacheco aceptó ir con ellos al cuartel voluntariamente. Por el contrario, los hechos descritos por la compañera del acusado, la señora Rivera Torres, denotan voluntariedad. Fue al cuarto a cambiarse de ropa, sin que nadie le acompañara. En ningún momento estuvo esposado. No le expresó a ella que tuviera alguna reserva a ir con la Policía.

Tampoco surge de las transcripciones de las declaraciones de los testigos que el señor Millán Pacheco estuviera incomunicado. La madre de su compañera no pudo verle en el cuartel porque ya salían a buscar el arma, pero lo pudo ver en la casa donde estaba escondida. Además, para ese momento ya el señor Millán Pacheco había admitido que era culpable del asesinato. Podía considerársele, más bien, un detenido. Por su parte, Rivera Torres sí pudo verle e, incluso, le llevó comida,

después de la confesión. Admitió que el señor Millán Pacheco nunca le expresó que le hubieran golpeado o maltratado.

Esta suma de detalles evidencia un panorama complejo sobre si el señor Millán Pacheco era sospechoso. A pesar de que hay varios detalles que denotan voluntariedad, el hecho de que cuatro policías lo fueran a buscar a su casa en dos patrullas y se lo llevaran al cuartel para entrevistarle, es un elemento de mucho peso. La balanza se inclina hacia la determinación de que, en efecto, una persona en sus circunstancias se hubiera sentido como sospechoso del crimen investigado. Debieron instruirle sobre sus derechos antes de entrevistarle.

Si no hubiera sido un sospechoso, y entrevistarle en el residencial representaba inconvenientes, se le podía citar para entrevistarle en el cuartel. Llevárselo en la patrulla para entrevistarle, sin leerle las advertencias de Miranda, fue cuando menos una imprudencia por parte de la Policía.

Esto nos lleva a analizar si el señor Millán Pacheco estuvo bajo custodia, que es el segundo requisito para que se active la protección de Miranda. Para ello, descritas las circunstancias que rodearon el interrogatorio, tenemos que evaluar si una persona razonable se habría sentido en libertad de irse. Esto nos llevará a concluir si se constituyó una restricción a la libertad a un grado similar al de un arresto.

Una persona a quien cuatro policías lo van a buscar a la casa y se lo llevan a un cuarto de interrogatorios en un cuartel de la Policía, sin que ningún familiar le acompañe, difícilmente puede sentir que está en libertad de irse. No llegó por sus propios medios. Tampoco tenía con quién irse. De ninguno de los

testimonios surge que la Policía le hubiera informado al señor Millán Pacheco que estaba en libertad de irse en cualquier momento.

Así que, si entendemos que estar bajo custodia significa estar bajo arresto o privado de la libertad de forma tan significativa como si fuera un arresto, visto desde la perspectiva objetiva del entrevistado, tenemos que concluir que el señor Millán Pacheco estaba bajo custodia. Concluimos esto a pesar de que el acusado aceptó irse voluntariamente con la Policía, que no surge del expediente que en algún momento expresara reservas en acompañarles y de que nunca se le esposó ni se le amenazó.

El tercer elemento que activa el requisito de que se lean las advertencias de Miranda es que se haya sometido al acusado a un interrogatorio con el propósito de extraer una confesión.

De la narración que hizo el agente Tarafa se desprende que le tomó por sorpresa la primera confesión del señor Millán Pacheco. La pregunta que motivó la declaración incriminatoria iba dirigida a aclarar una incongruencia en los datos de la investigación en curso y las declaraciones de Millán Pacheco en ese momento. Los tribunales estadounidenses han sostenido reiteradamente que, incluso, confrontar a un acusado con evidencia incriminatoria es claramente permisible y no constituye una conducta coercitiva por parte de la Policía. Ringel, op cit., Sec. 25:9, pág. 25-47.

El interrogatorio que activa las protecciones de Miranda es aquel que un policía puede prever razonablemente que extraerá una confesión incriminatoria. Según el agente Tarafa, la

respuesta del señor Millán Pacheco fue espontánea.[109] Según su descripción, la entrevista se encontraba en una etapa en que el señor Millán Pacheco narraba lo que hizo en la finca el día antes del asesinato.

> No hay que recurrir a los enfoques restrictivos de la Corte de Rehnquist. Desde su origen mismo <u>Miranda</u> no se aplica a confesión alguna a iniciativa del sospechoso. Lo que quiere considerarse o regularse es el interrogatorio policíaco, esto es, la conducta policíaca dirigida a obtener declaraciones incriminatorias del sospechoso bajo custodia. La situación que origina las reglas de <u>Miranda</u> es la del interrogatorio a un sospechoso bajo custodia a fin de obtener declaraciones incriminatorias; es esta situación la que se caracteriza por la atmósfera de coerción que las advertencias pretenden disipar.

Chiesa, <u>op cit.</u>, pág. 85, Sec. 2.3.

En este caso, no hubo insinuaciones ni requerimientos por parte del agente Tarafa para que el señor Millán Pacheco confesara. Tampoco hubo preguntas directas dirigidas a obtener una confesión. Por ello, albergamos dudas sobre si el interrogatorio iba realmente dirigido a obtener una confesión en ese momento. Se interrumpió muy pronto como para poder determinarlo con certeza. Sin embargo, si bien es cierto que las declaraciones del señor Millán Pacheco pudieron tomar por sorpresa al agente Tarafa en ese momento, por darse tan temprano en el interrogatorio, se nos dificulta creer que fuera

---

[109] La transcripción de la vista preliminar del 25 de junio de 2007 en que testificó el agente Tarafa, Apéndice del Recurso, pág. 68 provee lo siguiente:

"Testigo:  No, lo que él hizo fue que bajó la cabeza, eh, se echó a llorar y entonces ahí fue que me expresó yo lo maté, lo expresó, estaba llorando, entonces él me iba a… siguió como hablando, yo le dije espérate un momento aguántate, porque yo pude haberlo dejarlo [sic] que hablara porque era espontáneo de él, pero yo por salvaguardarlo a él le dije espérate un momento no me digas más na´."

totalmente imprevisible extraer una confesión a lo largo de la entrevista iniciada. Ello es así, máxime bajo unas circunstancias en que la Policía fue a la casa del señor Millán Pacheco a buscarle para interrogarle sobre un asesinato. Al respecto, le damos deferencia a la determinación del Tribunal de Primera Instancia.

Todo este análisis nos lleva a concluir que el señor Millán Pacheco era un sospechoso que se encontraba bajo custodia al momento en que la Policía le sometió al interrogatorio en que se extrajo una confesión de que él asesinó a la víctima. Por consiguiente, se le debieron leer las advertencias de Miranda desde antes que iniciara la entrevista. La omisión de esa responsabilidad resulta en que tiene que suprimirse esa primera declaración, en que el señor Millán Pacheco admitió que mató al señor León Ramírez.

B

Ahora bien, esto no dispone de todas las controversias en este caso. Queda por analizar si la lectura de las advertencias de Miranda, posterior a esa primera declaración, curó el defecto de omisión del que padeció la primera confesión y hace admisible la segunda declaración incriminatoria.

En Missouri v. Seibert, una pluralidad del Tribunal Supremo enumeró cinco factores que ayudan a determinar si son efectivas las advertencias de Miranda ofrecidas en medio de declaraciones incriminatorias. En este análisis se encuentra nuestra mayor diferencia con la opinión de este Tribunal. Aunque la opinión de pluralidad no nos obliga, de todos modos entendemos que este caso cumple con tres de los cinco requisitos

enumerados y que, un análisis de la totalidad de las circunstancias y de la voluntariedad que manifestó el acusado, nos permite concluir que las advertencias ofrecidas fueron efectivas.

El primer factor es si las preguntas y respuestas del primer interrogatorio fueron completas y detalladas. La evidencia demuestra que no hubo exhaustividad ni detalle en el primer interrogatorio. El testimonio del agente Tarafa, no controvertido en ese aspecto, detalló que durante la hora en que estuvo con el señor Millán Pacheco antes de la primera confesión, entablaron una conversación informal. Hablaron sobre diferentes temas no relacionados con la investigación: sobre Sabanetas, de conocidos en común que podían tener en ese barrio, de que allí vivía la ex esposa de Millán Pacheco, y hasta de la pensión alimenticia que éste debía pagar a sus hijos.

La declaración incriminatoria se dio casi al comienzo del interrogatorio formal. El agente comenzó cuestionándole al señor Millán Pacheco qué había hecho el día antes del asesinato. El interrogado comenzó con su descripción hasta que se le confrontó con que los guardias de seguridad no lo vieron salir de la finca ese día, como él aseguró. Ahí estalló en llanto y confesó el asesinato. Inmediatamente, el agente Tarafa interrumpió la confesión para hacer las advertencias de Miranda. Ahí terminó el primer interrogatorio. Como vemos, en ese primer interrogatorio no hubo ningún detalle de cómo sucedió el asesinato.

Más allá de la admisión concreta en que el señor Millán Pacheco dijo "yo lo maté, yo lo maté", no hubo traslapo entre la primera y segunda confesión, que es el segundo factor que nos

enumera _Missouri v. Seibert, supra_. De hecho, la primera confesión prácticamente solo consistió en admitir que era el asesino. Pero el aquí peticionario no ofreció ningún detalle de cómo ocurrió, cómo lo hizo, cuál fue el arma homicida, qué hizo con ella, con el cadáver y el vehículo, y todos los demás detalles que se vertieron en la segunda confesión, luego de las advertencias de _Miranda_. El agente Tarafa tampoco hizo preguntas dirigidas a obtener más detalles. Por el contrario, impidió que el señor Millán Pacheco continuara con las declaraciones incriminatorias.

Este caso sí cumple con dos de los otros factores de _Missouri v. Seibert_, _supra_. Hubo muy poco tiempo entre la primera y segunda confesión y el escenario era el mismo. Además, también era el mismo personal policiaco.

El quinto y último factor es el grado en que el interrogador trata el segundo interrogatorio como una continuación del primero. Entendemos que tampoco se cumple en este caso.

Para que este requisito se pueda dar por cumplido, la jurisprudencia señala que el agente investigador tiene que hacer, durante el segundo interrogatorio, constantes referencias al primero. El propósito es inducir al interrogado a repetir las admisiones detalladas en el primer interrogatorio. _Missouri v. Seibert_, _supra_, págs. 616-617.

Ese escenario no se dio en el interrogatorio a Millán Pacheco. El segundo interrogatorio no pudo hacer referencia a las respuestas y detalles del primero porque en la primera confesión no hubo detalles. Si alguno, no fue a la médula del

crimen investigado. Sólo se limitó a decir "yo lo maté, yo lo maté".

En Missouri v. Seibert, supra, el interrogatorio se llevó a cabo de forma sistemática, exhaustiva y realizada con destreza psicológica. Cuando la Policía terminó el interrogatorio quedaba poco que decir que tuviera potencial interrogatorio. Missouri v. Seibert, supra, pág. 616. Ese no es el escenario de este caso.

Este análisis nos lleva a concluir que las advertencias de Miranda ofrecidas entre medio de ambos interrogatorios fueron efectivas porque cumplieron sustancialmente con los factores enumerados en Missouri v. Seibert, supra.

Por ello, nos distanciamos de la opinión de este Tribunal. No podemos coincidir con la conclusión a la que llega la mayoría de que el interrogatorio fragmentado que se hizo al señor Millán Pacheco fue producto de un esquema intencional para extraer una confesión. No se pasó prueba sobre ello. Ni siquiera fue una alegación que se trajera durante el proceso por las partes. La petición de certiorari se concentró en que se debieron leer las advertencias de Miranda antes de la primera confesión y en que la renuncia que prestó antes de la segunda confesión no fue válida. La conclusión de que hubo un esquema intencional por parte de la Policía es una a la que llega este Tribunal *motu proprio*.

La mayoría pone el peso de la prueba en el Ministerio Público para rebatir la alegación de un esquema intencional para fragmentar las advertencias de Miranda. No tenemos problema en que así sea. Lo que ocurre es que el acusado no alegó la existencia de tal esquema. El Ministerio Público no puede

presentar prueba para refutar algo que no se alegó en ninguna etapa del procedimiento.

Como mencionamos anteriormente, entendemos que en este caso el resultado de la confesión fragmentada obedece más a una imprudencia de la Policía en el manejo del interrogatorio que a un esquema preconcebido e intencional para obtener declaraciones incriminatorias en violación de los derechos que Miranda intenta proteger.

C

Una vez descartamos la existencia de un esquema intencional para obtener declaraciones en dos fases, concluimos que este caso, con diferencias obvias, se aproxima más a Oregon v. Elstad, supra, que a Missouri v. Seibert, supra. Así las cosas, debemos atender al elemento de la voluntariedad para determinar si la segunda confesión es admisible en evidencia.

Una vez el agente Tarafa interrumpió a Millán Pacheco, para que no continuara con su confesión, le leyó las advertencias de un formulario que para esos propósitos utiliza la Policía y se lo dio a leer para que lo firmara. Ese formulario comienza por advertir que la persona interrogada es sospechosa de un delito; que tiene derecho a permanecer callado o lo que diga podrá usarse en su contra; que tiene derecho a un abogado y que si no tiene dinero se le conseguirá uno, sin costo alguno, antes de entrevistarle; que si decide contestar, en cualquier momento durante el interrogatorio puede decidir no contestar ninguna pregunta más; y que "su declaración tiene que ser libre, voluntaria, y espontánea y no se puede ejercer presión, ni amenaza, ni coacción para obligarlo a declarar".

El señor Millán Pacheco estampó sus iniciales al lado de cada una de las advertencias. Como si fuera poco, respondió que había entendido lo que se le había explicado y que, a pesar de ello, deseaba declarar.

En ocasiones anteriores ya hemos atendido casos en que se hace uso de este cuestionario. Es idéntico al que se utilizó en Pueblo v. Rivera Nazario, supra, pág. 890. También es similar al que se utilizó en Pueblo en Interés del Menor J.A.B.C, supra, pág. 558. De este último sólo lo diferencian algunas adaptaciones hechas para un menor de edad.

Aunque en el interrogatorio al agente Tarafa los abogados de la defensa intentaron implicar que las advertencias no fueron correctas porque no se utilizó un lenguaje en particular, hemos reiterado que no existe un lenguaje talismánico para efectuar las advertencias. Lo importante es que se hagan de forma tal que el acusado las entienda, se indague sobre la voluntariedad de la confesión y se evalúe la totalidad de las circunstancias. Pueblo v. Rivera Nazario, supra, págs. 574-575.

Las advertencias que se le ofrecieron al señor Millán Pacheco están desglosadas en un lenguaje sencillo, comprensible aun para una persona cuya educación formal consiste en haber culminado la escuela elemental. Debemos presumir que una persona que llega a ese nivel debe saber, cuando menos, leer y escribir.

También, la defensa insiste en que el agente Tarafa no se cercioró de que el señor Millán Pacheco entendiera las advertencias. Sin embargo, interrumpido por las múltiples preguntas de la defensa, el agente Tarafa llegó a responder que

sí le preguntó si entendía las advertencias.[110] Además, en el mismo formulario se le advierte que su declaración debía ser libre, voluntaria y espontánea, sin presión, amenaza ni coacción. El señor Millán Pacheco también estampó sus iniciales en esa parte del formulario.

Al Ministerio Público le corresponde el peso de probar que la renuncia al derecho contra la autoincriminación fue válida. Entendemos que en este caso se cumplió con el peso de probarlo. La renuncia del señor Millán Pacheco fue válida.

---

[110]En la vista preliminar, del 25 de junio de 2007, en el interrogatorio al agente Tarafa por parte de la defensa, éste declaró:

"Defensa: Y está seguro de que él las entendió.
Testigo: Él me dijo que sí, que, que se encontraba con él, yo le pregunte pues que si, estaba, si necesitaba algo, y él pues lo que hacía era llorar y llorando en ese momento porque estaba arrepentido.
Defensa: Ok, en su declaración jurada usted habla de que él leyó y que las firmó.
Testigo: Sí porque yo se las di, se las leí y se las di.
Defensa: Y no habla nada de que usted le haya explicado y que usted se haya cerciorado de que esas advertencias, él entendía lo que estaba pasando con él.
Testigo: Bueno, eso no le dije a él, peor a él se le preguntó las entendiste, o sea, eso es algo mandatario [sic] que se hace.
Defensa: Pero no lo… dice.
Testigo: No lo encontré.
Defensa: Que usted se cerciorara de que él entendiera eso.
Testigo: Pero es que, como como voy a cerciorar si yo no puedo entrar dentro de él como usted dice.
Defensa: Lo que…
Testigo: Yo le pregunto a él si él las entendió y él me contestó que sí.
Defensa: Ramón tú me estás admitiendo a mí un caso de una muerte, tú puedes ser procesado por ese asesinato, por esa muerte.
Testigo: Eso se le explicó.
Defensa: Porque usted no le dijo tú vas a ser procesado por homicidio, ¿verdad que no?
Testigo: No, se le habló que eso [es] un asesinato.

Apéndice del Recurso, pág. 67.

Estamos convencidos de que esta conclusión es cónsona con los más recientes desarrollos de la jurisprudencia federal relacionada a la renuncia al derecho contra la autoincriminación de un acusado. Ésta flexibiliza considerablemente los requisitos para la renuncia, que debe ser inequívoca. En Berghuis v. Thompkins, supra, se interpretó que el acusado renunció al derecho de la Quinta Enmienda meramente cuando respondió con un "sí" a la pregunta de si rezaba para que Dios le perdonara por lo que había hecho. Durante el resto del interrogatorio, que se extendió por más de dos horas, el acusado mantuvo silencio o no ofreció otras respuestas incriminatorias.

Si en ese caso se interpretó que el acusado renunció inequívocamente a su derecho a la no autoincriminación, nosotros no podemos hacer menos cuando el señor Millán Pacheco firmó las advertencias, declaró haberlas entendido y que reconocía que se tenían que dar voluntariamente, así como libre de presiones y coacción. Sin duda, la renuncia del señor Millán Pacheco fue mucho más inequívoca que la del señor Thompkins.

Más aún, las acciones del acusado posteriores a su confesión confirman nuestra apreciación. Luego de hacer la segunda declaración incriminatoria el acusado guió a la Policía a obtener la evidencia necesaria para corroborar su admisión. Los llevó al lugar donde escondió el arma y donde quemó el vehículo objeto de la disputa. Ese ánimo de cooperación es cónsono con las manifestaciones que el peticionario hizo al agente Tarafa, en el sentido de que estaba arrepentido por lo que había hecho y quería desprenderse de su sentido de culpa.

Como instruye <u>Oregon v. Elstad</u>, <u>supra</u>, suprimir una segunda confesión hecha luego de las advertencias de <u>Miranda</u>, en ausencia de tácticas coercitivas, es una extensión no deseada de <u>Miranda v. Arizona</u>, <u>supra</u>, si esa segunda confesión es fruto de la voluntad del declarante. "El hecho de que haya decidido hablar es altamente probativo". <u>Oregon v. Elstad</u>, <u>supra</u>, pág. 318. (Traducción nuestra.)

Concluimos que la segunda confesión, vertida luego de que se brindaran las advertencias de <u>Miranda</u> fue voluntaria. Por consiguiente, debe admitirse en evidencia.

IV

Por los fundamentos antes expuestos, suprimiríamos la primera confesión del acusado como evidencia y admitiríamos la segunda confesión, por haberse vertido de forma voluntaria y con pleno conocimiento del derecho renunciado.

Como se puede apreciar de una lectura de las opiniones en este recurso y las fuentes que ambas citan, existe discrepancia en cuanto al alcance de la decisión de <u>Missouri v. Seibert</u>, <u>supra</u>. Solamente el Tribunal Supremo Federal podrá aclarar ese alcance de manera concluyente.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado